720 F.Supp. 1258 (1989)
In re AIR CRASH AT DALLAS/FORT WORTH AIRPORT ON AUGUST 2, 1985.
Kathleen CONNORS, et al.
v.
UNITED STATES of America.
MDL No. 657. No. CA4-87-060-K, CA4-87-139-K.
United States District Court, N.D. Texas, Fort Worth Division.
September 1, 1989.
*1259 *1260 John Martin, Thompson & Knight, Dallas, Tex., for Delta Air Lines.
Alan Wilson, Law, Snakard & Gambill, Fort Worth, Tex., for Mrs. Connors.
John Herrick, Ft. Worth, Tex., for Mrs. Nassick.
Kathlynn G. Fadely, Asst. Director, Aviation, Douglas Coleman, Roy W. Krieger, Trial Attys., U.S. Dept. of Justice, Mark W. Bury, Trial Atty., F.A.A., and M. Timothy Conner, Chief, Gen. Litigation Div., U.S. Dept. of Commerce, Washington, D.C., for defendant U.S.

MEMORANDUM OPINION
BELEW, District Judge.
This lawsuit[1] arises out of an airplane crash that occurred at Dallas/Fort Worth International Airport ("DFW") on August 2, 1985. At the time of the accident, the aircraft, a Lockheed L-1011-385-1, was cleared for an ILS approach[2] to Runway *1261 17 Left (17L). The flight, identified as Delta Flight 191 (hereinafter DL 191) originated in Fort Lauderdale, Florida and was bound for Los Angeles, California, with an intermediate stop at DFW. It was equipped with a Bendix model RDR-1F monochromatic weather radar system.
At the time of the crash there were one hundred sixty-three (163) people on boardone hundred fifty-two (152) passengers and eleven (11) crew members. As a result of the crash, one hundred thirty-seven (137) people were killedone hundred twenty-eight (128) passengers, eight (8) crew members, including the Captain, First Officer and Second Officer, and one (1) person on the ground.

I. STATEMENT OF THE CASE
One hundred eighty-two (182) claims were made and one hundred fifteen (115) lawsuits[3] were filed against Delta Air Lines, Inc. ("Delta") as a result of the crash of DL 191.[4]
In a separate action, Kathleen E. Connors, widow of the pilot Edward N. Connors ("Captain Conners"), and Jean R. Nassick, widow of the Second Officer Nick Nassick, sued the United States individually and on behalf of the statutory beneficiaries under the Texas Wrongful Death Act[5] and on behalf of the estates of Connors and Nassick under the provisions of the Texas Survivors Act.[6] These two suits were consolidated with Delta's suit by Order of the Court. Delta joined as a Plaintiff in these suits against the United States of America alleging negligence on the part of the employees of the Federal Aviation Administration and the National Weather Service to establish liability and to recoup damages suffered by Delta as a result of the crash. These damages include money paid pursuant to settlements of personal injury and death claims[7] and judgments against it, as well as for the value of the aircraft.
On September 9, 1986, the Court granted leave to Delta to file a third-party complaint in all cases in which it had been named as a defendant. Once the consolidated pre-trial proceedings mandated by order of the Judicial Panel on Multi-District litigation was completed, Delta's third-party claims were bifurcated from all individual Plaintiff's cases. This Court retained jurisdiction over all the third-party claims and tried those claims with the original suit filed by Mrs. Conners, on the issue of liability alone.
At the conclusion of this trial it was estimated that the total value of claims paid and those still pending would amount to between one hundred fifty million ($150,000,000.00) and two hundred million ($200,- *1262 000,000.00) dollars, including the loss of the L-1011 aircraft, valued at twenty-four million seven hundred thousand ($24,700,000.00) dollars.

II. BACKGROUND INFORMATION

A. DFW Airport
Dallas/Fort Worth International Airport is one of the largest in area and busiest with respect to landings and takeoffs in the United States. There are four principal runways that run north and south.[8] These runways are 11,388 feet in length and have a heading of 173 degrees. They are numbered according to their magnetic bearing: 17L, 17R, 18L, and 18R.[9] The innermost runways, 17R and 18L, are approximately one mile apart. The Tower, terminals, hotels, and other buildings are located between the innermost runways.
There are four points that are considered gateways to the airport. Each point, or "corner post," is about 35 miles from the ends of the runways. The corner posts are known as Blue Ridge (northeast), Scurry (southeast), Acton (southwest), and Bridgeport (northwest). Depending on the direction of arrival, planes are brought over these corner posts by the Air Route Traffic Control Center ("ARTCC") and turned over to the Terminal Radar Approach Control ("Tracon") for landing alignment and sequencing. Generally, planes coming in from the west use Acton or Bridgeport and land on runways 18L or 18R, and planes coming in from the east use Blue Ridge or Scurry and land on 17L or 17R.

B. The Federal Aviation Administration
In 1958, Congress passed the Federal Aviation Act to centralize in a single entity, the Federal Aviation Administration, the authority to make rules and regulations concerning air safety and to develop a system for the safe and efficient use of the National Airspace. In 1966, the Federal Aviation Administration (FAA) was placed in the Department of Transportation.
Pursuant to its responsibilities under the Act, the FAA divided the continental United States and the airspace above into twenty (20) contiguous regions. Within each region is an Air Route Traffic Control Center (ARTCC). The Fort Worth ARTCC covers parts of five (5) states: Oklahoma, Texas, Arkansas, Louisiana, and New Mexico.

(1) The Air Route Traffic Control Center

The ARTCC is staffed by Air Traffic Controllers[10] who utilize radar and radio *1263 communications to coordinate and regulate the flights of all airborne craft within the region. The radar and communications systems are extremely elaborate and sophisticated.[11] Also assigned to the ARTCC is the Central Weather Service Unit ("CWSU") which aids the controllers in the dissemination of weather information to pilots in the region.

(2) Tracon

ARTCC controllers are responsible for bringing the planes bound for DFW to a corner post approximately thirty-five (35) miles from the airport, at which point the planes are turned over to the Tracon controllers. These controllers are located on the ground floor of the Tower at DFW. It is their responsibility to sequence, or align and space, the planes in an orderly fashion for landing. Tracon then turns the planes over to the Tower controllers as they begin their final approach seven (7) to ten (10) miles from touchdown or landing on the assigned runway.

(3) The Tower

Controllers in the Tower use radar, visual sightings, and verbal communication to provide air traffic control services and weather information to aircraft arriving at and departing from DFW. Once an airplane is "passed off" from Tracon to the Tower, the tower controller directs the final approach, landing, and taxi. The Tower is located in the area between runways 17R and 18L and is about equal distance (approximately one mile) from either end of the runways.

C. Weather Facilities
After the Weather Bureau was abolished in 1965, the National Oceanic and Atmospheric Administration (NOAA) was created as the administrative head of the various weather agencies and transferred with other weather related entities to the Department of Commerce. The organizational name of the Weather Bureau was changed to the National Weather Service ("NWS"). 15 U.S.C. § 311, et seq.
The NWS provides the aviation community with a variety of services from a number of different facilities. These services include general forecasting, issuance of warnings and advisories, consultations, and briefings.[12] NWS personnel do not communicate with pilots. Their role for aviation interests is to create weather information products for relay to FAA facilities, Air Traffic Controllers, airlines, and other such users.

(1) The Central Weather Service Unit

Following an air crash in 1977, the National Transportation Safety Board ("NTSB") recommended to the FAA that immediate action be taken for the development and implementation of a system for controllers to relay severe thunderstorm and tornado bulletins to aircraft in an airport terminal area. The FAA was urged to:
formulate rules and procedures for the timely dissemination by air traffic controllers of all available severe weather information to inbound and outbound flight crews in the terminal area.[13]
Following this pronouncement, the Department of Transportation/FAA and the NOAA/NWS entered into an agreement in 1980[14] whereby the NWS would operate CWSU's at each ARTCC. In order to implement this agreement for the Fort Worth Center, the NWS installed a radar facility at Stephenville, Texas ("SEP"), 72 miles from DFW Airport. The CWSU is located in the ARTCC building just south of DFW. The CWSU receives its radar image from SEP. The image received by CWSU is two minutes old due to the time it takes for the information to be translated into digital *1264 form, transmitted by phone lines, and retranslated.
The primary function of the CWSU at Fort Worth ARTCC is to provide weather information to air traffic controllers and staff, including ATC's in the ARTCC, Tracon, and Tower. The CWSU meteorologists do not communicate with the pilots, but pass the weather information to the ATC's in the form of briefings and forecasts. After the information is received from the meteorologist or weather coordinator, the ATC's disseminate it to the pilots.
The Weather Coordinator ("WC") functions as an interface between the NWS meteorologist and the Air Traffic Controllers. The WC is primarily responsible for the inter/intrafacility disseminations of Sigmets,[15] CWA's[16] and urgent Pireps.[17] WC's also provide assistance in the collection and dissemination of other significant weather information.

(2) The Weather Service Forecast Office

Responsibility for weather forecasting is divided into fifty geographic areas. There is roughly one forecast office for each state, although larger states, such as Texas, have more than one office. The Weather Service Forecast Office ("WSFO") in Fort Worth is located in the Federal Building in downtown Fort Worth.
The principal function of the WSFO is to provide general weather forecasts. The WSFO also performs specialized services for the aviation community. It provides a forecast for a particular airport, or "terminal forecast," which generally addresses weather conditions affecting airport ground functions. The WSFO also issues TWEBS (Transcribed En Route Weather Broadcasts), describing weather conditions along the most frequently flown routes across North Texas. A third type of forecast is given for International Travel.

(3) Weather Service Contract Meteorological Office

The Weather Service Contract Meteorological Office ("WSCMO") is located on the second level of the Delta hanger at DFW Airport in space leased from Delta. The observer makes visual surface weather observations each hour and relays such observations electronically to various NWS and FAA facilities. The observer notes cloud conditions, precipitation, temperature, dew point, wind, etc. If conditions warrant (i.e., weather deteriorates), the observer may make a special weather observation. The observer was functioning as an independent contractor on August 2, 1985.[18]

D. Weather

(1) Radar

Precipitation is the only weather observable by radar. Detectable precipitation appears as an image on a radar screen and is measured by Video Integration Processor (VIP) levels. These indices reflect the level of intensity of precipitation from VIP 1 (lowest) to VIP 6 (highest). Radar measures only the intensity of precipitation and does not measure the intensity of the winds, turbulence, etc. in the echo.[19] It is sometimes difficult for a meteorologist to determine whether the radar echo is precipitation, ground clutter, or anomalous propagation. Anomalous propagation is caused by atmospheric conditions other than precipitation.

(2) Downbursts

Thunderstorms can produce a downburst, or strong downdraft inducing an outburst of damaging winds on or near the ground, as occurred at DFW on the day of the crash. The downburst consists of the downdraft and its outflow. It originates from a convective storm.[20] Initially, an *1265 updraft forms due to the local heating of the terrain. When the updraft reaches condensation level, it cools and a cloud forms. If the cloud continues to grow, the air goes higher and higher, and all of the water vapor in the air condenses out. Finally, the water comes rushing down out of the cloud. The cold air associated with the downburst produces a very intense downdraft that comes down with the rain and, when it gets near the ground, spreads out horizontally and causes an outflow of air in different directions.
Downbursts are subdivided into macrobursts and microbursts according to the horizontal scale of damaging winds. A macroburst is a large downburst with its outburst winds extending in excess of 4 Km. (2.5 miles) in horizontal dimension. An intense macroburst often causes widespread, tornado-type damage. Damaging winds can be as high as 134 miles per hour. A microburst is a small downburst with its outburst and damaging winds extending only 4 Km. (2.5 miles or less). In spite of its small horizontal scale, an intense microburst can induce damaging winds as high as 168 miles per hour.[21]
Clouds producing downbursts are formed by convective activity. One type of such conductive cloud is the cumulus[22] cloud, generally appearing puffy with a flat base. They range in size from small clouds to large thunderstorms with damaging winds and hail and lightning within.

(3) Wind shear and Advisory Circular AC 00-50A

Wind shear is best described as a change in wind direction and/or speed in a very short distance. For example, if the wind changes from a 30 knot headwind to a 30 knot tailwind, the result is a 60 knot shear. There are several general categories of wind shear, such as frontal wind shears and downdrafts. DL 191 was confronted with wind shear emanating from a downdraft or downburst.
Advisory Circular AC 00-50A[23] gives an excellent description and explanation of the classic thunderstorm "downburst cell" which is as follows:

*1266 DOWNDRAFT SHEAR
There is a strong downdraft in the center of the cell. There is often heavy rain in this vertical flow of air. As the vertical air flow nears the ground it turns 90 degrees and becomes a strong horizontal wind, flowing radially outward from the center. Point A represents an aircraft which has not entered the cell's flow field. The aircraft is on speed and on glide slope. At Point B the aircraft encounters an increasing headwind. Its airspeed increases, and it balloons above the glide slope. Heavy rain may begin shortly. At Point C the "moment of truth" occurs. If the pilot does not fully appreciate the situation, he may attempt to regain the glide slope and lose excess airspeed by reducing power and pushing the nose down. Then in the short span of time between Points C and D the headwind ceases, a strong downdraft is entered and a tailwind begins increasing. The engines spool down [go to idle], the airspeed drops below V.ref, and the sink rate becomes excessive. A missed approach initiated from this condition may not be successful. Note that a missed approach initiated at Point C (or sooner) would probably be successful since the aircraft is fast and high at this point. Note also that the pilot of an aircraft equipped with a groundspeed readout would see the telltale signs of a downburst cell shortly after Point B; i.e., rapidly increasing airspeed with decreasing groundspeed.[24]
This advisory further provides that "[i]f the airplane is below 500 feet AGL and the approach becomes unstable a go-around should be initiated immediately. Airspeed fluctuations, sink rate, and glide slope deviation should be assessed as part of this decision."[25]
Dr. Fujita points out that an accident during the final approach can occur when an aircraft attempts to land through a strong microburst located on the glide slope near the approach end of a runway. In nearly all cases, an aircraft first experiences a headwind increase while entering a shower or virga. As a result, the aircraft gains altitude. When the pilot brings the aircraft altitude down to the glide slope, downflow and a tailwind are awaiting the aircraft. Unless full power is applied early enough to regain the altitude, the airplane could continue its rapid descent to the ground.[26]

III. THE SEQUENCE OF EVENTS

A. Overview
After crossing the Blue Ridge corner post at 5:52:09[27] Central Daylight Time ("C.D.T.") and heading southwest for landing at DFW, the crew of DL 191 saw building cumulus clouds north and northeast of DFW. They had a view of the airport where the sun was shining. As they approached, there were at least two cumulus clouds in the area. One of these clouds had been there for some time, developing over the outer marker.[28] This cell[29] has been referred to in the litigation as Cell C. South of and between Cell C and the north end of Runway 17L there was a second cumulus cloud evidencing more rapid development. This cloud became Cell D, the cell from which the microburst descended.
When DL 191 approached DFW it was vectored to the north (downwind leg), west (base leg), and then south (final). When the aircraft was put on final approach, rain was visible between the aircraft and Cell D. At that point it was possible to see the airport, but as the rain increased the airport *1267 went out of view.[30]
ATIS[31] Romeo had been issued at 4:47 and DL 191 received the following report at 5:35:33:
Weather six thousand scattered,[32] two one thousand scattered, visibility one zero, temperature one zero one, dewpoint six seven, wind calm, altimeter two niner niner two, runway one eight right one seven left, visual approaches in progress.
Persons at various locations at the airport were able to see the weather deteriorate. Mr. Del Prete, the WSCMO weather observer, completed observations during which he saw cumulonimbus[33] clouds to the north and northeast, blanketing the entire sky to the north, northeast at 5:51.
Personnel in Tracon were aware of thunder and the Tower's auxiliary generators were activated as a precaution. A Tracon controller had received a Pirep from a plane flying east through Cell D to the effect that it was difficult to hear over the rain. DL 191, however, was not on the frequency. Others on the ground watched the storm develop. It appeared to one observer to be a bad thunderstorm, a wall or curtain of water. The tower controller saw moderate rain progress to "heavy, heavy rain."
A controller notified all aircraft that there was a little rainshower just north of the airport, apparently referring to Cell C. There were observations of lightning in the west and northeast by persons in the Tower and on the ground.
In eight minutes, Cell D developed from a VIP 2 to a VIP 4. Since the storm was near the airport, SEP called the WFSO to advise them of its apparent severity. The WSFO was aware that a thunderstorm existed north of DFW airport.
As DL 191 was coming in to land it lost its altitude and made contact with the ground in a plowed field about 360 feet east of the extended center line of runway 17L and 6336 feet north of the runway threshold. The plane was in a wings level, nose high altitude, and on a heading of about 167 degrees magnetic. Following the initial impact, the plane ascended, went a short distance, and hit the ground again. After this second impact the plane continued, traversing Highway 114, striking a car and killing the occupant. The plane then proceeded toward two water tanks about 1700 feet beyond the highway. The airplane grazed the north tank and struck the south water tank about 3195 feet beyond the initial touchdown point, breaking apart. The plane made four separate and distinct ground contacts before breaking up and coming to a stop. There was no evidence of pre-impact separation or failure; the damage to the plane was caused entirely by the impact with the ground and subsequent structures.[34] Upon examination after the accident, it was noted that the thrust reversers had been deployed on each of the three engines, all of which were located in the tail section of the airplane.

*1268 B. Arrival Sequence
From 5:48:15 to 6:03:25 fifteen planes landed at DFW on Runways 17L and 17R. Immediately prior to the attempted landing of DL 191, one of these fifteen planes had to go around due to ground traffic, and two landed on 17R. The remainder landed on 17L.
Reports from the landing crews are varied. Some experienced little weather; others were in heavy rain inside the outer marker. The Learjet, the last plane to land before DL 191, entered rain shortly after passing the outer marker. It then encountered heavy rain at 6:04 and exited heavy rain about one mile to 1½ miles from the threshold of 17L. No crew, except DL 191, saw lightning coming out of Cell D.
Approximately twelve planes had taxied down the taxiways in preparation for takeoff on 17L or 17R. As they were waiting at the north end of the taxiway for entrance onto 17L or 17R, they were in an excellent position to see Cell D. These planes were approximately one mile north of the Tower. Specific observations will be discussed in the following section of this opinion.

C. Specific Chronology
The following is a chronology of the most significant events which took place during the flight of DL 191. All of the following times are stated in Central Daylight Time, August 2, 1985.

 Time Event
5:03:59 Fort Worth ARTCC Controller
 told DL 191 to expect Blue Ridge
 arrival.[35]
5:09:18 Fort Worth ARTCC attempted to
 give DL 191 vectors towards
 Scurry VOR.[36]
5:09:35 Captain Connors, in response to
 the foregoing ATC direction,
 asked, "How's the weather over
 Scurry?"[37]
5:10:53 Internal discussion between two
 controllers at Fort Worth
 ARTCC during which the PAXTO
 controller acknowledged with
 respect to the attempt to send
 DL 191 into an area of weather,
 "He didn't want no part of it."[38]
5:11:16 Fort Worth Center controller for
 Texarkana Sector directed DL
 191[39] to "expect a further clearance
 direct to Scurry." Captain
 Connors replied, "So we've been
 told, okay, sure looks better over
 Blue Ridge though. Weather
 looks better over Blue Ridge."[40]
5:11:36 After being told by the controller
 that the traffic doesn't look very
 good over Blue Ridge, Captain
 Connors stated: "I'd rather wait
 for an airplane than, uh, go fight
 a bunch of weather."[41]
5:12:26 After being told to go into a
 holding pattern south of Texarkana
 for 30 minutes,[42] Captain
 Connors responded, "Okay, we
 appreciate that, it sure looks a
 lot better that way, it looks kind
 of crummy down there at Scurry
 ...."
5:25:00 Richard Douglass, CWSU Meteorologist,
 left his post to take a
 dinner break.
5:35:26 Flight Engineer received ATIS
 Romeo which bore a time of 4:47
 and contained the following
 weather information: "Weather
 six thousand scattered, two one
 thousand scattered, visibility one
 zero, temperature one zero one,
 dewpoint six seven, wind calm,
 altimeter two niner niner two,
 runway one eight right one seven
 left, visual approaches in
 progress."

*1269
 Time Event
5:43:56 Captain Connors told Fort Worth
 Center, "I'm looking at a cell at
 about heading of two five five
 and it's a pretty good size cell
 and I'd rather not go through it
 I'd rather go around it one way
 or the other."[43] Reference was
 to the so-called "Blue Ridge
 thunderstorms."
5:45:00 Al Magazzine, a DFW Airport
 employee in Tower Cab for purposes
 of traffic count, noticed a
 build-up of clouds towards Las
 Colinas, a community northeast
 of DFW.[44]
5:49:00 Cell D first appeared on Oklahoma
 city radar, and would have
 appeared on Stephenville radar
 at approximately the same
 time.[45]
5:50:00 Jack Williams observed Cell C in
 northwest corner of Dallas County
 within 10 miles of DFW Airport.[46]
5:50:50 American 351 announced its intention
 to go around.[47] American
 351 then commenced go-around
 and later made a second
 approach, despite an FAA Inspector
 in the cockpit jumpseat
 having observed lightning during
 first approach.[48]
5:51:00 Del Prete (NWS Airport Weather
 Observer) completed observation
 during which he saw cumulonimbus
 clouds to the north-north-east,
 blanketing the entire sky to
 the north and northeast.[49]
5:51:19 Second Officer Nassick observed,
 "Looks like it's raining over Fort
 Worth"; an unknown voice commented
 "... Dallas."[50]
5:52:00 Radar photos confirmed the existence
 of Cell D on Stephenville
 radar as a VIP level 1.[51]
 DL 191 was at 11,500 feet and
 pointed straight at Cells C and D.
 These returns would likely have
 appeared clearly on DL 191's radar.
 As the flight descended
 from Blue Ridge, there would
 have been good radar returns
 from cells C and D until the aircraft
 turned northbound at approximately
 6:00.[52]
5:52:08 Captain Connors made radio contact
 with DFW Approach Control.
 He was talking with Feeder
 East Controller Robert Hubbert.[53]
 At the time of this initial
 contact, DL 191 was approximately
 over the Blue Ridge
 VOR, which is approximately 35
 miles northeast of the airport,
 and was at an altitude of 11,100
 feet MSL.[54]
5:54:00 Tollenaar, Captain of Metro 1756,
 encountered light rain just south
 of Lewisville, which he was in
 for approximately one mile;[55]
 the area of rain was fairly confined
 and clearly discernable.[56]
 Tollenaar was able to see 17L
 during his entire approach, including
 while flying in the rain.[57]
 Tollenaar painted a cell without
 difficulty; it was a red area,
 which is a contouring area, surrounded
 by a thin yellow area
 indicating a steep gradient.[58]
 Tollenaar testified that he would
 not have flown through what his
 radar was painting; he would
 have executed a missed approach.[59]

*1270
 Time Event
5:55:00 Tower controller Ferguson observed
 from the Tower Cab a
 cloud-to-ground bolt of lightning
 to the east-northeast associated
 with the gray cloud and area of
 rain.[60]
5:55:00- Lee Ankerson, walked outside
6:00:00 and joined two other mechanics.
 The three of them watched the
 storm develop. Ankerson says it
 "was big and it looked real
 bad."[61] He said it "looked like a
 bad thunderstorm."[62] He said it
 looked like a "wall of water," "a
 curtain," and the heaviest rain he
 had seen during his nine years at
 DFW.[63]
5:56:00 Since 5:52, Cell D had become a
 VIP 3, was quite pronounced,
 and was growing quite rapidly
 north of DFW. Cell D had enlarged
 on radar imaging five or
 six times its size at 5:52.[64]
 At this time DL 191 was 17 to 18
 miles from Cell D and could have
 scanned up to at least 32,000 feet
 with its radar, allowing it to see
 whatever weather Stephenville
 was painting.[65] Both cells could
 have contoured on airborne radar.
 The aircraft was pointed
 directly toward the cells.
5:56:26 Feeder East Radar Controller
 Hubbert notified all aircraft:
 "There's a little rain shower just
 north of the airport and they're
 starting to make ILS approaches
 ...."[66] Hubbert testified that
 he was talking about a weather
 area located in the position now
 identified as Cell C.[67]
5:58:00 Before going on break at 5:59,
 Jim Brecheen, an Air Traffic Assistant
 in the Tower Cab, saw
 one flash or bolt of cloud-to-ground
 lightning in the proximity
 of the rain to the northeast of
 the Tower.[68]
 Even with two-minute delay,
 CWSU radar would have displayed
 VIP 3 intensity of Cell D
 by 5:58. It was the practice of
 the CWSU to notify Tracon of a
 VIP 3.[69]
 Dixon, Captain of Cessna 340,
 with his radar on the 10 mile
 range, observed an intense echo
 with a very heavy rainfall gradient;[70]
 these observations had to
 be Cell D, and it was contouring
 and had a sharp gradient; Dixon
 was at 1,000 feet and was using
 a much wider radar beam than
 DL 191's, and even with his less
 capable radar Dixon had no problem
 depicting a contouring cell.[71]
 Dixon was within a couple of
 miles of DL 191's location at this
 time.[72]
 While Dixon was making his radar
 observations, DL 191 was
 pointed straight at the cell and
 these cells remained directly
 ahead of it for the next 2 minutes;
 the crew should have been
 able to see Cell D contouring on
 radar almost straight ahead,
 slightly to the right, at a range
 of 10-15 miles; Cell C would
 have been 30 degrees to the right
 and smaller, not contouring.[73]
 DL 191 was at 5,800 feet AGL,
 considerably higher than Dixon,

*1271
 Time Event
 so 191 should have had less problem
 with ground clutter. The
 cells Dixon painted unquestionably
 were within the tilt range of
 DL 191's radar at this time.[74]
 As DL 191 approached the airport,
 its radar would have gone
 through Cell C and show Cell
 D.[75] Cell C would not have shadowed
 or blocked the view of Cell
 D.[76]
 According to CWSU Chief Meteorologist
 Paup, between 5:52 and
 6:06, radar information about the
 VIP level of Cell D was available
 to the CWSU but was not communicated
 because Douglass was
 not at his post. Paup also acknowledged
 that the CWSU can
 help pilots avoid thunderstorms
 by providing this type of information.[77]
5:58:00- According to his own testimony,
5:59:00 controller Tarbet informed supervisor
 Joe Connors about hearing
 thunder during this time period.
 Tarbet assumed there was possibly
 a thunderstorm going on outside.[78]
5:59:43 Feeder East Controller Hubbert
 referred to "little bitty thunderstorm"
 that "looks like a little
 rain shower." Hubbert was talking
 about a cell in the location of
 Cell C.[79] (Note: DL 191 did not
 hear this transmission.)
5:59:47 As DL 191 turned back to the
 north, Price said, "We're gonna
 get our airplane washed"[80] referring
 to a visual observation by
 Price.[81] Price was looking forward
 and could see something
 coming out of the base of the
 cloud.[82] At this time Delta
 Flight 963 was seeing the bowlshaped
 cloud outside the outer
 marker and they anticipated flying
 through it. DL 191 was flying
 almost due west and could
 see Cell D straight ahead and to
 the left of them.[83] DL 191 was
 at 5,000 feet, and just about to
 turn right to 340 degrees. They
 obviously were flying close to
 some type of convective activity
 and rain.[84] The First Officer
 was pointing out that they were
 going to be flying through some
 rain, and it is likely he was expecting
 a fair amount of rain.
6:00:00 NWS Stephenville Weather Radar
 Operator Encinas observed
 "a small thunderstorm cell."[85]
 He referred to it as "a rapidly
 developing thunderstorm."[86]
 Encinas acknowledged that a
 storm that developed from VIP 2
 to VIP 4 in eight minutes (such
 as Cell D) would have strong
 convective activity.[87] Encinas
 observed Cell D as having a pin-point
 VIP 4 intensity.[88]
 VIP 4 echo indicated the "probability"
 of a thunderstorm, according
 to Richard Douglass.[89] Ac-

*1272
 Time Event
 cording to the testimony of Paup,
 Chief Meteorologist at the
 CWSU and Mr. Douglass' immediate
 supervisor, there is a correlation
 with level 4 returns and
 thunderstorm activity, and the
 CWSU would report a VIP 4 intensity
 to the Tracon (not just
 the presence of an echo). The
 CWSU Meteorologist, had he
 been at his post, could have seen
 that the thunderstorm was in the
 vicinity of the airport to the
 north of the DFW Airport.
 FAA Air Traffic Assistant Barbara
 Foe observed lightning to
 the east-northeast from the FAA
 Tower Cab.[90]
6:00:13 Feeder East Controller Hubbert
 observed a "little rain shower"
 just north of the airport. This
 transmission was not heard by
 DL 191, because it was not on
 the frequency.
6:00:33 AR-1 Controller asked American
 Flight 351, "Do you see the airport
 yet?" American 351 First
 Officer Patrick Davis replied,
 "As soon as we break out of this
 rain shower we will." DL 191
 heard this transmission.
 During American 351's second
 approach, FAA Inspector Neumeier,
 a licensed air transport pilot,
 again sighted lightning.
 Neumeier took no action to prevent
 the flight from continuing,
 nor did he suggest or order it to
 execute a missed approach or to
 make a Pirep.[91]
6:00:00- Captain Sam Toler, Piedmont
6:04:00 Flight 70, saw from DFW a large
 sheet of water emanating from
 an intense thunderstorm. Captain
 Toler testified that it was
 the worst thunderstorm he had
 ever seen: It was a solid sheet or
 wall of water moving toward the
 airport with unbelievable intensity.[92]
6:01:00 Bill Glenn, a Department of Public
 Safety employee, observed
 from DFW cloud-to-cloud lightning
 north of the airport all the
 way across each runway approximately
 five minutes before the
 accident.[93]
 Mike Porter, an FAA Local Control
 West Controller in the Tower
 Cab, observed two lightning
 strikes to the west of the area of
 weather, and another lightning
 strike to the east-northeast[94]
 where Cell D was located.
 Encinas called Fort Worth
 WSFO to alert them that there
 was a thunderstorm over DFW.
 Encinas believed that the storm
 was of consequence because it
 was located near an airport. He
 reported a pinpoint VIP 4 cell
 with a top of 40,000 feet.[95]
 By this time, Williams, of the
 Fort Worth WSFO, acknowledged
 that he knew that a thunderstorm
 existed over the town
 of Coppell, Texas, which is located
 immediately to the north of
 Runway 17L at DFW Airport.[96]
 Del Prete observed lightning to
 the north-northeast of DFW.[97]
 First Officer Chris Robbins, Delta
 Flight 1051, observed from
 DFW a cloud developing rapidly,
 which was, in his words, "billowing,
 boiling, exploding." There
 was dark, heavy rain and a bamboo
 curtain effect one-half to one
 mile from the end of the runway,
 which appeared to be a thunderstorm.
 The easternmost part of
 the cloud was right off 17L.[98]
6:01:20 Feeder East Controller Hubbert
 transmitted that a "little rain
 shower just popped up north of
 the airport." DL 191 was not on
 the frequency.[99] This return

*1273
 Time Event
 was in the area of Cell D.[100]
6:02:00 The United States claims that a
 conversation between Tarbet and
 Joe Connors regarding thunder
 occurred at about 6:02. Thus,
 Joe Connors was aware of thunder
 by no later than 6:02.[101]
 Al Magazzine, a DFW Airport
 employee in the Tower Cab, observed
 a thunderstorm consisting
 of a heavy dark area of precipitation
 to the north end of the
 Runway 17 complex.[102]
 Del Prete heard thunder[103] and
 associated the rainshower with
 the thunderstorm.[104] After the
 accident, Del Prete told Jeff
 Brown, "Conditions at least
 should have prompted concern
 among air traffic controllers."[105]
6:02:30 DL 191 was advised that they
 were 6 miles from the outer
 marker. They were requested to
 turn left heading 180 to join the
 localizer at or above 2,300 feet,
 and they were cleared for the
 ILS 17 Left approach. This was
 acknowledged by Captain Connors
 at 6:02:43: "Delta one-niner-one
 Roger, all that appreciated."[106]
 The rain should have contoured
 on DL 191's radar; they were on
 base leg just south of Lewisville
 (a small city east of DFW) heading
 west. The radar would have
 been showing the crew that if
 they flew ahead for a mile or two
 and then turned left toward the
 airport, they would be turning
 toward a contouring cell. At this
 time, Dixon was seeing a contouring
 cell and other pilots were
 seeing red cells.[107] With their
 radar tilted up 7 degrees the
 crew could have interrogated the
 whole base of the cloud. Even if
 they had the bottom of the beam
 parallel to the ground they would
 have seen rain beneath the
 cloud.[108]
6:03:04 Tracon received a Pirep from
 Southwest Flight 99 (not heard
 by DL 191) that it was hard to
 hear in the rain he was in.[109] At
 this time, Southwest Flight 99
 was inside Cell D, approximately
 1½ miles from the end of Runway
 17L, at an altitude between
 6,300 feet and 6,900 feet.[110] The
 Pirep was not disseminated by
 Tracon to pilots or to other controllers.[111]
6:03:06 DL 191 was approximately 8
 miles north of the threshold of
 17L at 2800 feet. At this time,
 the north side of the microburst
 was about 2.5 miles north of the
 end of the runway and it was
 above the surface at some altitude;
 therefore, DL 191 was between
 5 and 6 miles from the
 microburst.[112] Under Dr. Fujita's
 analysis, DL 191 was then at
 an altitude of less than 1000 feet
 and below the altitude of the microburst.
 The microburst likely
 was directly ahead of the aircraft,
 and at the same altitude,
 when the crew turned final.[113]
 Thus, the microburst would have
 been within the tilt range capability
 of DL 191's radar. DL
 191's radar had the ability to
 scan up to 15 degrees, meaning
 at this distance from Cell D it
 could scan about 8600 feet above
 the altitude of the aircraft. The
 microburst would have been

*1274
 Time Event
 straight ahead of the airplane at
 that time, enabling the crew to
 scan it with the beam parallel to
 the surface of the earth; that is,
 the radar operator would not
 have had to tilt up the radar to
 see the microburst.[114] Rain falling
 from Cell C at this time
 would not have attenuated the
 radar signal and a good display
 of Cell D would still be on DL
 191's radar scope. This factual
 finding was also made by the
 NTSB, which found there would
 have been a radar display up to
 two miles to the cell.[115] The
 DFW microburst itself (Cell D),
 as opposed to precipitation associated
 with Cell C, might have
 caused a ground shadow on DL
 191's radar before they penetrated
 the cell whether or not the
 radar was adjusted properly.
 Nonetheless, even if DL 191's radar
 beam had been fully attenuated
 and a radar shadow were
 present, this should have not
 have misled the crew into flying
 into the microburst.[116]
6:03:20 Skipworth, the Local East Controller
 in the Tower Cab who
 took control of DL 191 inbound
 from outer marker, saw moderate
 rain progress to heavy rain
 when the Learjet was four or
 five miles final. He described it
 as "a definite wall of rain."[117]
6:03:31 AR-1 Controller advised Delta
 Flight 557 that "we're getting
 some variable winds out there
 due to a shower on short final
 out there north end of DFW."
 DL 191 was on frequency, so it
 should have heard the transmission.
 An unidentified crew-member
 of DL 191 remarked
 "stuff is moving in ...."[118]
6:03:32 Captain Joe Coughlin and First
 Officer Dave Davis of DL 963
 saw from DFW what appeared to
 be a water spout.[119] Both observed
 dark sky and heavy rain
 off the approach end of 17L and
 two bright shining parallel phenomena
 extending to the
 ground.[120]
6:03:58 Captain Connors called Controller
 Skipworth and said that DL
 191 is "out here in the rain, feels
 good." This rain was so light it
 could not be seen by other aircraft
 6 to 8 miles away;[121] further,
 it is implausible that DL
 191 was in rain so heavy that the
 crew could not see forward.[122]
 DL 191 was in rain from the time
 Captain Connors said "out here
 in the rain feels good" until they
 entered the microburst. The intensity
 of this rain was very
 light; two aircraft that were not
 far off could not see any rain,
 and the Learjet, which immediately
 preceded, and American
 539, which immediately followed,
 reported that they did not enter
 any precipitation until they got
 down to about the point where
 DL 191 entered the rain shaft;[123]
 the only possibility is that some
 very light rain came down between
 these two airplanes, because
 no one else could see it;[124]
 it was not enough to seriously
 impair 191's ability to see where
 they were going. If there had
 been enough rain to impair their
 ability to see forward, other aircraft
 would have been able to see
 it.[125] Light rain does not negate
 forward visibility in an airplane.[126]

*1275
 Time Event
 At approximately the same instant,
 the following conversation
 occurred between Kennedy (Tower
 Cab) and Joe Connors (Tracon
 Supervisor):
 "We've been busy with these
 SWAPS and hadn't paid any attention,
 but that is heavy, heavy
 rain off the approach end of both
 runways ...."
 Joe Connors, referring to his radar,
 replied to the Tower:
 "Yeah, I can see that."[127]
 Joe Connors' reply referred to
 Cell D, which was a solid area
 about two miles in width, two
 miles north of the airport.[128]
 Because of the time it took for
 Kennedy to answer Joe Conners'
 call, it is clear that Kennedy actually
 observed the heavy, heavy
 rain at or before 6:03:30.[129]
6:03:58 Joe Connors earlier had seen a
 speckled area on the radar in the
 vicinity of the outer marker (presumably
 Cell C);[130] by this time
 he saw a solid area (Cell D) about
 two miles wide and about two
 miles north of the airport.[131]
6:04:00 Hildebrand, Fujita and others
 concluded that the microburst
 impacted the ground very close
 to 6:04, maybe as early as about
 6:03:30 or 6:30:35, but not significantly
 later; at 6:04, the rain
 shaft was on the ground and the
 Learjet's encounter confirms this
 fact.[132] Based on the observations
 of American 351 of the area
 in which they entered heavy rain,
 and other pilot observations and
 witness statements, bounds can
 be placed on the descent of the
 microburst. The 6:04 timing of
 impact is accurate and consistent
 with these pilot observations.
 Furthermore, the pilot observations
 confirm that the location of
 the impact was a little over 2
 miles out.[133]
 According to the data, there
 were a number of rain shafts
 that descended from the cloud
 base at different times; there
 was some light rain that descended
 from the cloud prior to the
 microburst. The microburst itself
 started descending some
 time after 6:00, probably about
 6:01, although it may have started
 descending slightly later if it
 fell at a higher rate, but certainly
 no later than about 6:02.[134]
 The Stephenville radar bisected
 Cell D at about 17,000 feet down
 to some altitude below the cloud
 base. In doing so, SEP radar
 measured a VIP 3 level echo and
 then at 6:04 saw a VIP 4. Thus,
 between 6000 feet and 17,000
 feet there was a sufficient
 amount of rain for the SEP radar
 to see.[135]
 The base of the clouds in the
 DFW area was 6000 feet. This
 figure is based upon pilot observations,
 the fact that the temperature
 from DL 191's DFDR
 showed a temperature inversion
 between 6000 and 7000 feet, additional
 information from ground
 observers, the Roxbury photos
 which confirmed the 6000 feet
 base, and Dr. Fujita's conclusion
 that the bases were 6000 feet.[136]
 Specifically, the bases of Cells C
 and D were both about 6000
 feet.[137]
 The microburst descended at a
 rate between 2000 fpm and
 maybe 3000 fpm. It exited from

*1276
 Time Event
 the base of the cloud at around
 6:01 and hit the ground at 6:04
 traveling 6000 feet in three minutes
 (2000 fpm). Dr. Fujita plotted
 the microburst descent at
 about 3500 feet or so in the minute
 between 6:03 and 6:04; extrapolating
 from that figure, the microburst
 exited the cloud base at
 6:02. Dr. Fujita has the microburst
 traveling the 6000 feet
 from the base of the cloud to the
 ground in two minutes (3000
 fpm). It is more likely that the
 descent rate was 2000 fpm based
 upon looking at peak vertical velocities
 of the winds measured by
 DL 191 as it flew through the
 microburst, which were about
 3000 fpm. The maximum velocity
 of the microburst downward
 would be higher than the
 velocity of the progression of the
 microburst toward the ground
 because the microburst had to
 push all this air out of the way
 as it fell down toward the
 ground. It is not possible to determine
 the exact descent rate,
 but between 2000 and 3000 fpm
 is scientifically sound.[138]
6:04:18 First Officer Price: "Lightning
 coming out of that one."
 Captain Connors: "What?"
 First Officer Price: "Lightning
 coming out of that one."
 Captain Connors: "Where?"
 First Officer Price: "Right
 ahead of us."[139]
 DL 191 had entered and been in
 the rain continuously since at
 least 6:03:58,[140] until after initial
 impact. DL 191 was already inside
 the rain falling out of Cell D
 at this time, and hence in the
 thunderstorm, at the time of the
 First Officer's sighting of the
 lightning.
 The First Officer made a very
 clear statement that he saw
 lightning. He unambiguously
 stated that he saw it out of "that
 one," meaning a specifically identifiable
 piece of weather.[141] At
 this time, Price clearly was looking
 forward and saw lightning
 coming out of "that one ahead of
 us." The lightning came from a
 rain shaft in Cell D.[142] They did
 not penetrate that rain shaft until
 approximately a minute later,
 when Captain Connors said
 "watch your speed" at 6:05:17
 and commented "wash that off a
 bit" at 6:05:05.[143]
6:04:30 The "lightning coming out of
 that one" exchange was followed
 by 7 seconds of silence. When
 Captain Connors made no response,
 Second Officer Nassick
 responded at 6:04:30, "you get
 good legs don't ya."[144]
 Second Officer Nassick's comment
 was not a casual cockpit
 comment.[145] His reference to
 "good legs" was to legs of the
 trip,[146] as it was the practice at
 Delta that the Captain and First
 Officer alternate flying legs.[147]
 Second Officer Nassick was concerned
 and was pointing out a
 deteriorating situation and poor
 flying conditions.[148]
6:04:00- Eastern Airlines Flight 654, Captain
6:05:00 Al Stanley, saw from DFW
 what appeared to be a tornado.
 Captain Stanley described the
 rain as a wall of water or a sheet
 or shaft of heavy rain. The Copilot
 of Eastern 654 called it a
 "hail shaft," and the Flight Engineer
 referred to it as a "microburst."
 Captain Stanley saw one

*1277
 Time Event
 or two lightning strikes in the
 right side of the rain before observing
 the tornado. The storm
 he observed undoubtedly was a
 thunderstorm.[149]
 After encountering extremely
 heavy rain and light to moderate
 turbulence, the Captain of the
 Learjet, Lewis, added an extra 25
 knots to his approach speed;[150]
 he also decided to fly his approach
 high and not go all the
 way to minimums because of the
 weather he had encountered.[151]
 Captain Lewis admitted that
 while he was flying his approach
 he had his hands full;[152] these
 observations are consistent with
 Hildebrand's microburst descent
 rate and times.[153]
 As he was turning inbound
 (6:03:36-6:04:26), Captain Dobson
 of American 539 was able to see
 DL 191.[154] American 539 was
 cleared for the approach 7 miles
 from the outer marker and was
 in visual meteorological conditions,
 with at least 3 miles of
 forward visibility.[155] There was
 no rainshower in front of Dobson,
 except the one just off the
 runway;[156] Dobson did not see a
 second rain shaft at any point
 during his approach.[157] Dobson
 did not encounter any rain until
 he executed his go-around and
 actually penetrated the cloud
 that was generating the storm.[158]
 Dobson neither saw nor encountered
 any other rain shaft that
 would have prevented him from
 seeing the one that was just
 north of 17L.[159] Dobson testified
 that there were no other cells
 producing lightning at 6:04:18
 when Price commented about
 lightning on the DL 191 CVR.[160]
 Dobson was not in rain when he
 got to the location where 191
 said "out here in the rain feels
 good."[161]
6:05:00 Robertson was flying an Aero
 Commander northeast of the
 storm at this time looking south
 at the weather.[162] Robertson
 was bothered by DL 191 approaching
 this weather, thus he
 watched the aircraft continuously
 as it entered and then exited
 the rain.[163] He was bothered because
 of the storm's intensity
 and location; Robertson could
 not say exactly why, but he did
 say he expected to be wrong
 about his caution and thought he
 would see DL 191 roll out into
 the bright sunshine, but of
 course 191 did not.[164] Robertson
 actually witnessed DL 191 penetrate
 the rain shaft.[165] At the
 time DL 191 flew into the rain
 shaft, Robertson said that the
 "storm had such a defined edge,
 there was no gradual thing going
 into it, it was so defined that if
 you entered the storm, if you
 froze the frame right there, you
 could see the forward half of
 that aircraft was obscured, back
 half of the aircraft was in bright
 sunshine; I mean it was just that
 quick."[166] Robertson indicated
 that there was nothing to the

*1278
 Time Event
 north of the storm that would
 have prevented DL 191 from seeing
 it.[167]
6:05:05 DL 191, on glideslope, passed
 1,000 feet AGL.[168] According to
 Delta procedure, the flight is
 supposed to be stabilized below
 1,000 feet.[169] At 6:05:08, Captain
 Connors commented, "762 in the
 baro."[170] This was an indication
 to First Officer Price that Captain
 Connors intended to go
 down to 200 feet, which is the
 decision height for the approach,
 and at that time he would decide
 whether they would land or execute
 a missed approach.[171]
 When he advised Price of this, it
 told First Officer Price that they
 were going to continue down to
 200 feet and then make a decision
 on whether to execute a
 missed approach. The Captain
 announced this decision height
 after First Officer Price had advised
 of "lightning right ahead
 of them coming out of that
 one."[172]
6:05:04- DL 191's airspeed increased from
6:05:18 153 to 173 knots.
6:05:19 Captain Connors recognized the
 airspeed increase by stating,
 "Watch your speed."[173]
6:05:20 Sound of intense rain can be
 heard on CVR.
6:05:21 DL 191 continued descending
 along the final approach course
 toward the area of developing
 weather. At 6:05:21, the Captain
 warned the First Officer,
 "You're gonna lose it all of a
 sudden, there it is." To exhortations
 of "push it up, push it up,
 way up" by both the Captain and
 the Second Officer, the First Officer
 added airspeed.
6:05:28 Delta experienced a performance
 loss (wind shear) of 44 knots.
6:05:30 Eleven seconds after Captain
 Connors noted the airspeed increase
 at 6:05:19, he stated,
 "That's it."
6:05:35 Sound of microphone keying
 from DL 191's air-to-ground radio.[174]
6:05:35- Upon encountering a descending
6:05:36 and violent vortex, the first of
 the three multiple vortices encountered
 by DL 191, the aircraft
 began experiencing a roll to
 the right of at least 22 degrees[175]
 even though the pilot
 attempted to control the roll by
 using full left aileron input.[176]
6:05:36 From this point forward, the
 crew of DL 191 was no longer
 attempting to land the aircraft
 on that approach but was attempting
 to perform what some
 people call an escape maneuver,
 a go-around, or a missed approach.
 Others have characterized
 it as simply trying to fly the
 aircraft and avoid ground impact.
6:05:52 Initial touchdown while DL 191
 was still in heavy rain.
6:05:56 Gene Skipworth instructs Delta
 Flight 191: "Delta go
 around."[177]

IV. APPLICABLE LAW
1. These actions are brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.
2. Jurisdiction and venue properly lie with this Court under 28 U.S.C. § 1346(b) and 28 U.S.C. § 1402(b), respectively.
3. Texas law applies to determine the rights and liabilities of the parties. 28 *1279 U.S.C. § 2674. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Brooks v. United States, 695 F.2d 984 (5th Cir.1983). See Opinion filed by this Court on September 22, 1986.
4. Parties who asserted that the air traffic controller's negligent conduct was a substantial cause of crash of aircraft during landing have the burden of persuasion. Delta Air Lines, Inc. v. U.S., 561 F.2d 381 (1st Cir.1977).
5. Under Texas law, liability of the United States for negligence allegedly causing an aircraft accident is to be determined by the ordinary rules of negligence and due care. American Airlines, Inc. v. United States, 418 F.2d 180, 191 (5th Cir. 1969); United States v. Schultetus, 277 F.2d 322, 325 (5th Cir.1960), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); Associated Aviation Underwriters v. United States, 462 F.Supp. 674, 681 (N.D.Tex.1978). Brooks v. United States, 695 F.2d 984 (5th Cir.1983).
6. Under Texas law, a plaintiff has the burden of establishing each of three essential elements of actionable negligence. The elements are as follows: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from such breach. Atchison, Topeka & Santa Fe Ry. v. Standard, 696 S.W.2d 476, 478 (Tex.App.1985); Gray v. Baker and Taylor Drilling Co., 602 S.W.2d 64, 65 (Tex.Civ.App.1980); Abalos v. Oil Development Co., 544 S.W.2d 627, 631 (Tex.1976).
7. Whether or not a legal duty exists under a given set of facts is essentially a question of law to be determined by the Court. Gray v. Baker and Taylor Drilling Co., 602 S.W.2d 64, 65 (Tex.Civ.App. 1980); Abalos v. Oil Development Co., 544 S.W.2d 627, 631-633 (Tex.1976).
8. Under Texas law, proximate cause includes two elements: (1) cause in fact, and (2) foreseeability. Williams v. Steves Industries, Inc., 699 S.W.2d 570, 575 (Tex.1985); Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 549 (Tex.1985).
9. Cause in fact is established if the injury would not have occurred "but for" the act or omission. Harrison v. Harrison, 597 S.W.2d 477, 484 (Tex.Civ.App. 1980); Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359, 365 (1957); Hopson v. Gulf Oil Corp., 150 Tex. 1, 237 S.W.2d 352, 355 (1951). Texas courts use the term "substantial factor" in the context of the "but for" requirement; that is, if a negligent act or omission is a substantial factor in bringing about the injury or without which no harm would have occurred, the act or omission is a cause in fact of the injury. See Nixon v. Mr. Property Management Corp., 690 S.W.2d 546, 549 (Tex.1985).
10. The foreseeability requirement under Texas law requires that the injury be of such a general character as might reasonably have been anticipated, and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen. Harrison v. Harrison, 597 S.W.2d 477, 484 (Tex.Civ. App.Tyler, 1980); Motsenbocker v. Wyatt, 369 S.W.2d 319, 323 (Tex.1963).
11. Under Texas law proximate cause cannot be established by mere guess or conjecture; it must be proven by evidence of probative force. McClure v. Allied Stores of Texas, Inc., 608 S.W.2d 901, 903 (Tex.1980). See also, Moorhead v. Mitsubishi Aircraft Int'l, Inc., 828 F.2d 278, 283 n. 24 (5th Cir.1987).
12. Though falling below requisite standard of care, an act or omission is not actionable unless also shown to be a substantial cause of complained of injury. Delta Air Lines v. U.S., 561 F.2d 381.

V. DELTA LIABILITY

A. Crew Responsibility
1. It is well-established that the pilot-in-command of an aircraft is directly responsible for, and is the sole authority as to, the operation of that aircraft. 14 C.F.R. § 91.3; Carney v. United States, 634 *1280 F.Supp. 648, 652 (S.D.Miss.1986), aff'd, 813 F.2d 405 (5th Cir.1987); See also, Moorhead v. Mitsubishi Aircraft Int'l., Inc., 828 F.2d 278, 285 (5th Cir.1987); American Airlines, Inc. v. United States, 418 F.2d 180, 191-92 (5th Cir.1969); Associated Aviation Underwriters v. United States, 462 F.Supp. 674, 681 (N.D.Tex.1978).
2. The duties of the pilot and of the controllers are concurrent. However, the operational control of the aircraft is not assigned to air traffic control; this is assigned to the air carrier and the pilot-in-command. 14 C.F.R. § 121.537; Baker v. United States, 417 F.Supp. 471, 485 (W.D. Wash.1975).
3. Pilots of all commercial passenger-carrying planes have a specific obligation to fully apprise themselves of prevailing and expected weather conditions along the route of their flights. In re Air Crash Disaster at Boston, Mass., July 31, 1973, 412 F.Supp. 959, 968 (D.Mass.1976), aff'd sub nom Delta Air Lines, Inc. v. United States, 561 F.2d 381 (1st Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).
4. The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes and instruments; a pilot cannot disregard the weather conditions he sees around him. Moorhead v. Mitsubishi Aircraft Int'l Inc., 828 F.2d 278, 285 (5th Cir.1987); Spaulding v. United States, 455 F.2d 222, 226-27 (9th Cir.1972) (applying Texas law); Peters v. United States, 596 F.Supp. 889, 895 (E.D.Pa.1984) (a pilot cannot ignore the weather information he has been given or disregard the weather conditions he sees around him).
5. Where dangerous weather conditions are clearly visible or known, a pilot should recognize them through his mandatory weather training and is obligated to look out for and avoid these weather conditions. Associated Aviation Underwriters v. United States, 462 F.Supp. 674, 681 (N.D.Tex.1978); Black v. United States, 441 F.2d 741, 743 (5th Cir.1971), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).
6. The crew of an airline transport is required to conduct its operations pursuant to applicable regulations, good operating practices, and the procedures imposed by the airline itself. Baker v. United States, 417 F.Supp. 471, 483 (W.D.Wash. 1975).
7. Delta's Flight Operations Procedures Manual contains a notation regarding the use of radar in thunderstorm conditions. This notation states that thunderstorm conditions should be avoided whenever possible. If early evasive action is not practicable, the manual indicates that certain practices should be followed:
Avoid areas where sharp changes in rainfall intensity occur, any echoes which are rapidly changing in shape, size, or intensity, or any echoes which have prominent scallops, hooks or fingers by at least:
5 miles at 10,000 feet or below.
These clearances are predicated on using the 50 or 100-mile range on the L-1011's airborne weather radar. The manual further states that weak echoes or areas of weak rainfall gradient may be flown through or adjacent to "if judgment dictates this to be the most desirable procedure."
8. It is negligence on the pilot's part to land or take off in an obvious thunderstorm. Spaulding v. United States, 455 F.2d 222, 227 (9th Cir.1972) (applying Texas law); Neff v. United States, 420 F.2d 115, 116 (D.C.Cir.1969), cert. denied, 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970).
9. A pilot who is not certain as to the presence of a wind shear nevertheless may be negligent in flying too close to thunderstorm activity even if he does not penetrate the thunderstorm cell itself. McKinney v. Air Venture Corp., 578 S.W.2d 849, 859-60 (Tex.Civ.App.1979).

Flying into the thunderstorm
10. Prior to departure from Ft. Lauderdale, Delta's Flight Control Dispatch and Meteorology Department provided *1281 the flight crew of DL 191 with a routine dispatch package. This package contained the following weather documents: the reported weather at DFW Airport and at the flight's alternate destination, San Antonio; a terminal weather forecast for DFW indicating widely scattered moderate rainshowers and thunderstorms with moderate rainshowers; an en route forecast indicating isolated thunderstorms, moderate rainshowers over Oklahoma and northern and northeastern Texas with a few isolated tops above 45,000 feet; and Delta Metro Alerts applicable to the route of flight, one of which stated that an area of thunderstorms was expected over Northern and Northeastern Texas. These forecasts were prepared by Delta meteorologists. These forecasts advised the flight crew of DL 191 that the atmosphere around the DFW airport was unstable and capable of producing an airmass thunderstorm.[178]
11. As noted, the flight crew received ATIS Romeo at 5:35:26 containing weather information including the temperature (101), and dewpoint (67).
12. By 5:51:19, the flight crew was aware of rain over the DFW area as indicated by comments on the CVR:[179] "Looks like it's raining over Ft. Worth."
13. At 5:56:28, the Feeder East controller broadcast to all airplanes that "there's a little rainshower just north of the airport and they're starting to make ILS approaches...." DL 191 was on the frequency and its flight crew heard this transmission.
14. At 5:59:37, DL 191 was about seven miles northeast of the storm and was requested to turn right to 340 degrees. Between 5:51 and 6:00, the microburst-producing cell (Cell D) had intensified from VIP 1 to VIP 4; the nose of the aircraft was pointed southwest toward this cell until 5:59:37. Except for a period between 5:55:53 and 5:57:19, during which a prelanding checklist was completed, the flight crew was relatively free of in-cockpit duties. During this period the flight crew would have been free to use the weather radar to observe Cell D and to manipulate the antenna tilt to analyze the storm structure and intensity. Since the storm cell had reached a VIP 4 by 6:00[180], the cell would have contoured on their radar during this period.
15. By 5:59:47, with the statement by the First Officer, "we're gonna get our airplane washed," the Captain's reply, "What?" and the First Officer repeating the statement, it was apparent to the flight crew of DL 191 that their flight path would take them through the area of rain about which they had been advised and which they had observed. The Comment by Second Officer Nassick regarding Price "getting good legs" was an acknowledgment that flying conditions were not optimal.
16. At 5:59:54, the flight crew of DL 191 switched to Arrival Radar-1 frequency and contacted the Arrival controller.
17. At 6:00:36, the Arrival Radar-1 controller asked American Flight 351, two aircraft in front of DL 191, if it was able to see the airport. The flight crew replied, "As soon as we break out of this rainshower we will." This transmission was overheard by the flight crew of DL 191, and they thus were aware that the rainshower they were to encounter was of sufficient intensity to obscure forward vision by pilots of landing aircraft.
18. At 6:02:35, DL 191 was cleared for the ILS approach to Runway 17L.
19. At 6:03:30, the controller broadcast: "and we're getting some variable winds out there due to a shower on short final out there north end of DFW." This transmission was overheard by the flight crew of DL 191 who thus were aware of variable winds associated with the rainshower located between them and the airport.
20. At 6:03:34, the deteriorating weather conditions caused a member of DL 191's flight crew to remark, "Stuff is moving in...."
*1282 21. By 6:03:58, DL 191 had begun to encounter rain, as confirmed by the Captain's report upon initial contact with the Tower: "Tower, DL 191 heavy, out here in the rain, feels good."
22. At 6:04:01, DFW Tower cleared DL 191 to land and advised of winds 090 degrees at 5 knots, gusts to 15.
24. Prior to 6:04:18, the First Officer observed lightning coming out of Cell D, and reported to the Captain, "Lightning coming out of that one." When asked by the Captain, "What?" the First Officer repeated his observation. When asked by the Captain, "Where?" the First Officer stated the location to be "Right ahead of us." Since the aircraft was already in Cell D,[181] this language indicates that the First Officer was able to see a rain shaft from Cell D directly in their path, that it was emitting lightning and that the flight crew still had sufficient forward visibility to make that observation until encountering intense rain at 6:05:20.
25. Lightning is a reliable indicator of a thunderstorm.[182]
26. At no time during the final approach did the flight crew of DL 191 ask for information on weather conditions from any one of several sources available to them. This is significant not because such information would have caused the crew to discontinue the approach; indeed, the crew already had the information warranting a decision to forego landing. Rather, the crew's failure to solicit additional weather information evidences an unreasonable disregard for risk of landing in unstable weather.
27. Building cumulus clouds are convective clouds which can easily and very quickly become thunderstorms. Even without the presence of intense rain, lightning or thunder, pilots know they represent a potential hazard and should be avoided.
28. It was common knowledge in the industry that there is the potential for a microburst within any convective activity or thunderstorm.[183] The presence of building cumulus clouds and the heavy rainshowers should have alerted the crew to the possibility of a microburst.[184]
29. Delta pilots are taught never to fly into the area of a cell depicted by a contour on airborne weather radar. Delta pilots are taught that wind shear and microbursts are associated with thunderstorms.[185]
30. Microbursts are so rapid in development and transient in duration that two airplanes, one following another through the same area, often observe and experience entirely different events. It was therefore unreasonable for the crew to rely on the absence of Pireps from other planes in deciding to continue the approach.
31. Other airplanes scanned the storm at very close range using their radar sets near the time of the accident. All of these airplanes' radars painted the storm as an area of solid red (corresponding to a contour on the RDR-1F radar) with few or no transitional color areas. This return indicated an intense storm cell.[186]
32. Subsequent to 5:49:29, the CVR of DL 191 contains no conversation attributable to use of airborne weather radar by the flight crew. The lack of such conversation indicates the failure of the flight crew to utilize their radar while approaching the DFW airport or Cell D.
33. By utilizing different tilt angles, the flight crew of Delta Flight 191 could have determined the shape, size, location, intensity, *1283 and hazard of Cell D during their approach.[187]
34. Had DL 191 utilized its airborne weather radar, the crew would have noted sharp changes in rainfall intensity and a contour associated with Cell D, which according to Delta policy, would have required the flight crew to avoid Cell D.[188]
35. The crew of DL 191 should have been aware of the volatility of the type of weather in the DFW area on August 2, 1985. The large temperature/dew point spread should have alerted the crew to the danger of downburst or microburst activity.[189]
36. The report of wind gusts to the flight crew of DL 191 by the Local Controller at 6:04:01 provided the crew with one more indication of the danger of microburst activity.[190]
37. The flight crew of DL 191, through both their own observations and from ATC communications during their descent and approach to DFW airport, had sufficient information to assess the developing weather situation along the final approach to Runway 17L and make a proper decision either to continue the approach or to take alternate action.
38. The crew of DL 191 knew or should have known that:
a. isolated thunderstorms had been forecast for the DFW area;
b. there was a large temperature/dew point spread at DFW;
c. there were rapidly building cumulus clouds in the vicinity of DFW;
d. lightning had been observed directly in the path of the aircraft;
e. there were contouring radar returns in the vicinity of the north end of the runway;
f. the cloud into which DL flew appeared dark and threatening;[191] and
g. thunderstorms present the hazard of microburst and dangerous wind shear.
39. The crew of DL 191 knew or should have known of the existence of a thunderstorm in the vicinity of DFW Airport and nonetheless continued the approach. In fact, weather conditions in the terminal area at the time of and immediately before the crash were better known to the crew than to the ATCs.
40. In view of the foregoing findings of fact, the Court holds that attempting to land the aircraft in a thunderstorm constituted negligence on the part of the crew of DL 191, and proximately caused the crash. Failure to Execute Missed Approach
41. Two minutes prior to initial ground contact, at 6:03:52, the aircraft was on final approach in landing configuration, descending onto the ILS glide slope at an altitude of about 2000 feet above the ground, and slowing to a target speed of 150 knots. First Officer Price was flying the aircraft, and the Captain was handling the air-ground communications.
42. Aerodynamically, the flight of DL 191 on August 2, 1985, proceeded relatively uneventfully until 6:05:05, the final 47 seconds of the flight. The airplane was descending through a point about 1000 feet above the ground, on the ILS glide slope, at 154.2 knots (Vref[192] plus 17 knots), and holding a nose-up 4.022 degrees pitch attitude.[193]
43. At 6:05:05, the plane was at an altitude of about 1000 feet, and lightning had been observed in its path. The Captain announced his intention to take the airplane down to 200 feet before making a decision to go-around. At approximately *1284 the same time, the aircraft began experiencing a slowly increasing head wind and slight updraft, and thrust was reduced to about half of normal approach thrust. At 6:05:15, the head wind began increasing more rapidly, and, in spite of thrust reduction to idle, the airspeed increased to 173 knots at 6:05:19, two seconds after the onset of a strong downdraft that accompanies entry into heavy rain.[194] At this point, the existence of a downburst should have been obvious to a pilot trained in the subject.
44. In the next ten seconds, the head-wind decreased by 28 knots. Before near takeoff thrust was applied, this shear, together with the increasingly strong downdraft, resulted in a loss of 44 knots of airspeed to 129 knots, 21 knots below target airspeed.[195] Probably in response to flight-director commands,[196] the pilot nosed up the aircraft to an unusually high pitch attitude that maintained the flight path near the ILS glide slope in spite of the severe speed loss. It is evident that in the heavy rain the First Officer was flying fully on instruments. To this point no word or action by the crew indicated an intention to discontinue the approach.
45. At 6:05:19, the Captain warned the First Officer to "watch your speed," a reference to a rapid airspeed (performance) increase which DL 191 began to experience at 6:05:05. This increase in airspeed indicated a wind shear encounter.
46. At 6:05:20 the sound of intense rain was heard on the CVR, indicating that DL 191 encountered the intense rain shaft associated with the microburst beneath Cell D.
47. At 6:05:21, the Captain warned the First Officer that "You're gonna lose it all of a sudden, there it is," a reference to an anticipated rapid airspeed (performance) loss characteristic of wind shear encounter.
48. The 6:05:19 and 6:05:21 warnings by the Captain to the First Officer were clearly in anticipation of an encounter with wind shear.
49. Between 6:05:25 and 6:05:29, thrust was increased to between 1.46 and 1.47 Engine Pressure Ratio (EPR), just under go-around power.
50. The dramatic airspeed loss of 44 knots at 6:05:28 should have removed any doubt in the pilot's mind that the plane was traversing severe wind shear.[197]
51. At 6:05:32, some airspeed had been recovered due to the high thrust and a momentary reversal of the horizontal wind component, but the aircraft was still below the target speed, flying at a 16 degree nose-up attitude as the downdraft increased 2500 ft./minute. At this point, thrust was reduced somewhat from 1.45 EPR to 1.33 EPR, and the aircraft momentarily stabilized on the glide slope. This is a clear indication that the First Officer was not aborting the approach, despite a wind shear encounter and clear evidence of hazardous weather known to the flight crew.[198]
52. At 6:05:35, at slightly above 600 feet and at approximate airspeed of 140 knots, the aircraft experienced a passage through a horizontally disposed vortex flow. From this point forward, the crew of DL 191 was no longer attempting to land the aircraft on that approach, but was attempting to keep the craft airborne. During the last 17 seconds of the flight, the crew could not possibly have escaped from the microburst due to the complexity and intensity of the component winds.
53. The fact that the aircraft survived the initial impact without breaking apart indicates that the descent had been significantly arrested.
54. Avoidance of ground contact would have been likely if the missed approach had been executed when the Captain first perceived indications of microburst wind shear *1285 at 6:05:19, while the airplane was between 700 and 800 feet above the ground.
55. The Delta Pilot Operating Manual warns that if the aircraft is less than 500 feet above the ground in shear conditions and glide slope deviation exceeds one dot, a missed approach must be initiated. FAA Advisory Circular AC 00-50A contains a similar caution.
56. The Pilot Operating Manual also advises that the procedures for landing in wind shear are general guidelines to be followed; good judgment must dictate a go-around at any point in the approach and landing phase if conditions appear less than safe.
57. In otherwise normal conditions, it may be reasonable for a pilot to continue an approach when wind shear is experienced above 500 feet. The 500 foot reference in the Advisory Circular is a bottom line beyond which a pilot does not have the option of continuing the approach.[199] However, when deteriorating weather conditions evidence a threat of microburst or severe downburst, a pilot may be negligent in adhering to the 500 feet rule of thumb. Here, the crew had several indications of the potential for microburst and should have been "spring loaded" for such an eventuality. They were aware of the large temperature/dew point spread, wind changes and gusts, had observed lightning, and had experienced wind shear and heavy rain.[200] The crew had already taken an unreasonable risk by continuing their approach in a thunderstorm. The occurrence of wind shear should have prompted the crew to take immediate action to execute a missed approach.
58. A prudent pilot would execute a missed approach by 6:05:18, when encountering a dramatic performance increase of 20 knots. The crew has seen lightning, identified a thunderstorm, and has encountered a performance increase. There was no explanation for continuing at this point. Every clue the crew had received was worse than the previous one; weather conditions were deteriorating as heavy rain was encountered at 6:05:20. The crew of Delta flight 191, by 6:05:20, needed no more clues or information in order to make a decision to execute a missed approach.[201]
59. During 6:05:19 to 6:05:35, the First Officer of DL 191 was flying the glide slope, rather than maintaining recommended pitch attitude for wind shear recovery as he should have.[202]
60. After experiencing the effects of a severe wind shear only 80 feet above the guideline height for executing missed approaches, and with knowledge that they were flying in a thunderstorm, the pilot of DL 191 was negligent in failing to execute a missed approach.
61. The failure to execute a missed approach constituted a proximate cause of the crash.

B. Corporate Negligence

Failure to Train Pilots Adequately
62. Delta has a flight training department which has the responsibility of assuring that its pilots receive the necessary training as well as that required by FARS.
63. When a pilot joins Delta he is given initial training for a certain seat; e.g., First Officer in a particular type of aircraft. Thereafter, a pilot is given additional training in the same aircraft but for a different seat.
64. Transitional training is given to a pilot when he moves from one seat in one aircraft to the same seat in another type aircraft.
65. Delta gives its pilots a variety of proficiency checks. These checks include annual recurrent ground school which is composed of one day of training pertaining to equipment and one day of training on *1286 timely topics such as windshear or current industry trends.[203]
66. Captains are required to have two proficiency checks or other approved checks every calendar year with at least one proficiency check, training on-line, or line oriented flight training ("LOFT").[204]
67. Each of these training checks is allotted four hours, but since certain maneuvers may be waived, the proficiency check may last less than four hours.[205]
68. Captain Connors would have had a total of only four hours per year in a simulator actually manipulating the controls.[206]
69. Before 1980, simulator windshear training was not provided to Delta pilots. After 1980, as time permitted, Delta pilots received wind shear simulator training.
70. According to expert testimony, wind shear training must be given at every opportunity to keep pilots aware of the necessary maneuvers.
71. Response to wind shear cannot be practiced in line operations, so pilots must continually be refreshed as to the appropriate wind shear recovery procedures in a simulated environment.
72. In wind shear training it is important to have a methodical approach: (1) the detection and avoidance if at all possible; (2) an immediate missed approach in the case of severe windshear encounter (anything in excess of 20 knots is an indication of severe windshear; Delta encountered a shear of 44 knots); (3) when in a serious situation perform the escape maneuver by using maximum thrust and increasing the pitch up to the stickshaker[207] or activation of the stall warning, if necessary, to stop the descent. Delta did not have such an approach.[208]
73. In 1982, Captain Kater of Delta's Flight Training Department wrote a memo to L-1011 pilots encouraging but not requiring wind shear simulator training be given to those pilots who were up on everything else in training. Evidently the pilots who were behind in their training were to receive no wind shear training.
74. The wind shear training given to Delta pilots was a simple version, and the pilots were not told that an actual windshear encounter could be much more complicated.[209]
75. No records of windshear training are kept by Delta merely because none is required by the FAA.[210]
76. There are no documents or evidence showing the amount of windshear simulator training that the crew of DL 191 received.
77. An FAA audit found that (1) Delta's training program provided little time for training for situations encountered in the operational environment and (2) there was no training in such areas as cockpit management and crew coordination, judgment, adverse weather operations, or specific problems Delta encounters in line operations.[211]
78. An FAA audit found that Delta was only upholding the minimum required standards on proficiency checks and that failures were not being recorded. Instead, the proficiency check airmen were recording the failures as "incomplete."[212]
79. This Court finds that, although Delta's overall training program including windshear has been lax, it is not so derelict as to be negligent. *1287 Delta Meteorology and Flight Control Dispatch Department
80. Delta Air Lines Meteorological and Flight Control Dispatch Departments are each located at the Atlanta Hartsfield International Airport, in Atlanta, Georgia.
81. Delta Meteorology is a section within the Dispatch Department, located at Atlanta Hartsfield International Airport in Atlanta.
82. The Meteorology Department is staffed by fourteen meteorologists. Only three or four are on duty at one time, including one manager. The forecast positions are manned seven days a week, twenty-four hours a day.
83. Dispatchers are briefed on the weather by the meteorologists so they can provide weather information to Delta flight crews.
84. Flight control or the dispatcher can communicate with all Delta flights over Delta's own radio network.[213]
85. CFR 121.601, "Aircraft Dispatcher Information to Pilot in Command", requires the dispatcher to provide the Captain with all current reports or information on airport conditions and irregularities of navigation facilities that may affect the safety of the flight.
86. Subpart B of CFR 121.601 provides that before a flight begins the dispatcher shall provide the pilot in command with all available weather reports and forecasts of weather phenomena that may affect the safety of the flight, including adverse weather phenomena such as clear air turbulence, thunderstorms and low altitude windshear for each route to be flown and each airport to be used.
87. Subpart C of CFR 121.601 states that "During a flight the aircraft dispatcher shall provide the pilot in command any additional available information of meteorological conditions, including clear air turbulence, thunderstorms, low altitude windshear, and irregularities of facilities and services that may affect the safety of flight.
88. The dispatcher originates the flight plan and provides weather tailored for the flight.[214]
89. If a pilot has questions about the weather, he can call Dispatch.[215]
90. The sources of weather available to the dispatcher include Delta's own in-house meteorologists who have access to all NWS products.
91. Delta's dispatchers and meteorologists also have available to them a weather radar monitor manufactured by Kavouras.[216]
92. Gliedt, the Delta dispatcher, described the Kavouras radar monitor as a TV set and computer hookup with which he could dial into all NWS radar sites, including SEP, and display "whatever it is that they are displaying."[217]
93. A pilot should be more likely in a terminal area to give a Pirep to the ATC than to the dispatcher.[218]
94. The pilot's best use of the dispatcher is when the pilot approaches his destination, maybe 100 miles out.[219]
95. When the pilot gets in the terminal area nothing exceeds the convenience and capability of his own airplane radar.[220]
96. The dispatcher does not replace the responsibility of the NWS or ATC's to provide weather information to planes in flight.
97. Delta dispatch did not contact DL 191 at any time after the flight checked in *1288 over New Orleans with its required progress report.
98. The failure of the crew of DL 191 to contact the dispatcher after entering the terminal area was not negligence.
99. The failure of the dispatcher to contact DL 191 after the New Orleans contact was not negligence.

Failure to Report Medical Information
100. Over the years, Captain Connors had suffered to a minor degree various medical problems such as vertigo, Bruxism (grinding of the teeth, especially during sleep), anxiety, cardiac, respiratory, and back pain.
101. None of these medical problems was disabling for more than a few days at a time.
102. The drug Stelazine was prescribed for Captain Connors on numerous occasions.
103. Valium was also prescribed for Captain Connors.
104. Captain Connors, to be qualified to fly, was required to hold a Class 1 medical certificate.[221]
105. Any drug currently used must be reported to the FAA.[222]
106. A pilot is to report to a flight superior if he is under any medication and let the physician decide whether or not the medication should be reported on the airman's application for a medical certificate.[223]
107. The taking of Valium and/or Stelazine would prevent the physical certification of Captain Connors to fly.[224]
108. Captain Connors took Stelazine from September 1982 to the summer of 1985 and this would have disqualified him from flight status.[225]
109. Captain Connors failed to satisfy the mandatory requirements for reporting medical information.
110. Captain Connors was negligent in failing to report his medications and satisfy the requirements for reporting medical information.
111. There was no evidence as to when Captain Connors last took medication prior to August 2, 1985, the date of the crash, that could have affected him.
112. Although Captain Connors did not seem as alert during the final moments of the flight as he had been earlier, the evidence is too speculative as to whether Captain Connors was under the influence of any medication at the time of the accident.
113. The accident in question was not proximately caused by Captain Connors' failure to report his medications and to satisfy the requirements for reporting medical information.

VI. GOVERNMENT LIABILITY

A. Failure to Relay Weather Information
1. The duties and responsibilities of air traffic controllers are set forth in the manuals of the Federal Aviation Administration. In re Air Crash Disaster at New Orleans (Moisant Field), La., 422 F.Supp. 1166, 1176 (W.D.Tenn.1975), aff'd, 544 F.2d 270 (6th Cir.1976).
2. Under the FAA Air Traffic Control Manual, the first priority of an air traffic controller is separation of aircraft. FAA Order 7110.65D. The provision of weather information is secondary to the primary duty of separation. The air traffic controller must decide, in his judgment, whether other duties permit the performance of these services. Mallen v. United States, 506 F.Supp. 728, 735-36 (N.D.Ga.1979).
3. Air traffic controllers are required to give all information and warnings specified in the manuals, and in certain situations they must give warnings beyond the manuals. Warnings not contained *1289 in the manuals must be made only when the danger is immediate, extreme, or known only to the federal personnel; or when the controller is in a better position to evaluate a given situation or to make more accurate observations than the pilot. Davis v. United States, 824 F.2d 549, 550 (7th Cir.1987); First of America Bank-Cent. v. United States, 639 F.Supp. 446, 455 (W.D.Mich.1986).
4. Government personnel in the DFW Tower on August 2, 1985, were in possession of the following pertinent information concerning the weather that was not transmitted to the crew of DL 191:
(a) the fact that a thunderstorm was occurring off the approach end of the threshold of runway 17L;
(b) the fact that "heavy heavy" rain (as reported by Mr. Kennedy to Joe Connors in the Tracon) was observable from the Tower. This heavy, heavy rain was described by eye witnesses as a wall or curtain of water, portions of which resembled a tornado;
(c) the presence of cloud to ground lightning strokes in the vicinity of the storm to the north of the field beginning as early as 5:55 p.m. and continuing up until at least shortly before the accident. At least five FAA employees in the Tower saw lightning before the accident;
(d) the presence of cumulonimbus (thunderstorm) clouds, observed by the official NWS weather observer, Mr. Del Prete at 5:51 p.m. Mr. Del Prete promptly reported his sightings to Tower personnel; and
(e) radar information showing precipitation returns on the north end of the runway.
5. DFW Tower personnel breached a duty in failing to provide incoming aircraft of the existence of extreme and hazardous weather north of the airport. Although the weather was observable by incoming flights, the controllers did not know this to be a fact, and were not justified in assuming it. The controllers should have sought confirmation of incoming crews' awareness of the hazardous weather.
6. The CWSU meteorologist, on duty on the date of the accident, breached his duties in the following respects:
(a) He took a lengthy dinner break in the government cafeteria beginning at approximately 5:25 p.m. without making any arrangements to see that the weather was monitored during his absence.
(b) He failed to insure that a continuous weather watch was maintained during his absence from his duty post.
7. The Weather Coordinator on duty in the CWSU at the time of the accident breached his duties in the following respects:
(a) He failed to maintain a continuous awareness of all present and forecasted weather conditions that could effect the safe and expeditious flow of air traffic within the center air space and to serve as the focal point for the collection and dissemination of pertinent weather information as required by the Traffic Management Handbook;
(b) He failed to maintain a continuous weather watch during the meteorologist's absence from his post; and
(c) He failed to monitor the weather on radar during the absence of the meteorologist.

B. Failure to Change Runways
8. The Air Traffic Controller manual never requires that a runway be changed; it only lists criteria to be considered in contemplating a change.[226]
9. Wind is the primary factor in electing to change runways.[227]
10. The ATC Manual directs that, if feasible, the runway most aligned with the *1290 wind is to be used when wind velocity is greater than or equal to 5 knots.[228]
11. There was no wind shift before the accident.[229] The winds as a whole favored no particular direction, so landing direction should not have been changed.[230]
12. Wind criteria for a runway change were not met on August 2, 1985.[231]
13. Controllers change runways due to weather only if pilots refuse to fly through it.[232]
14. Whenever ATC issues a vector, a direction, or a clearance to a pilot, which in the pilot's judgment would jeopardize the safety of the aircraft and its occupants, that pilot has an absolute duty to reject the same, to so inform ATC, and to request a new direction. In re Air Crash Disaster at Boston, Mass., July 31, 1973, 412 F.Supp. 959, 989 (D.Mass.1976), aff'd sub nom Delta Air Lines, Inc. v. United States, 561 F.2d 381 (1st Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).
15. No pilot had requested a runway change prior to the crash.[233]
16. Pilots have the responsibility to decide and are the final authority as to the runway which will be used for landing. Miller v. United States, 378 F.Supp. 1147, 1151 (E.D.Ky.1974), aff'd, 522 F.2d 386 (6th Cir.1975).
17. Controller's failure to change runways prior to the crash did not constitute negligence.

C. Proximate Cause
18. In order for breaches of duty by government employees to support a finding of negligence, the acts must have proximately caused the crash.
19. Air traffic controllers have the right to rely upon the assumption that a pilot knows and will abide by the applicable Federal Aviation Regulations. Controllers are not required to foresee or anticipate the unlawful, negligent, or grossly negligent acts of pilots. Colorado Flying Academy, Inc. v. United States, 506 F.Supp. 1221, 1228 (D.Col.1981), aff'd, 724 F.2d 871 (10th Cir.1984), cert. denied, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986); First of America Bank-Cent. v. United States, 639 F.Supp. 446, 456 (W.D. Mich.1986); Air Service, Inc. v. United States, 18 Av. Cas. (CCH) 17,556, 17,566 (N.D.Miss.1983).
20. Any failure of the air traffic controllers to warn a pilot of the presence of a storm in his path cannot be regarded as a continuing proximate cause after the pilot himself discovered its presence, appreciated the danger, and decided to fly ahead into it. Black v. United States, 441 F.2d 741, 745 (5th Cir.1971), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).
21. The Court is of the opinion that the crew of DL 191 possessed substantially all of the weather information potentially available from government sources. In fact, the crew was aware of additional conditions unknown by government sources, e.g., wind shear and lightning in Cell D.
22. The Court considers the failure of governmental employees to pass on weather information to have been inconsequential to the fate of DL 191 in that there is no evidence that the crew would have acted differently with this confirmation of information already known.

VII. CONCLUSION
Defendant, the United States of America, is entitled to a judgment in its favor inasmuch as Plaintiffs have failed to prove that the United States of America, through its agents, servants or employees, was guilty *1291 of any negligence that proximately caused the air crash of DL 191 on August 2, 1985. Judgment will be entered consistent with the foregoing opinion.
NOTES
[1] The trial, with interruptions, lasted 14 months. In addition to a large number of exhibits, there are more than 18,000 pages of transcribed testimony. The attorneys submitted excellent briefs and indices which were highly beneficial to the Court.
[2] The Instrument Landing System (ILS) is designed to provide an approach path for exact alignment and descent of an aircraft on final approach to a runway.

The ground equipment consists of two highly directional transmitting systems and, along the approach, three (or fewer) marker beacons. The directional transmitters are known as the localizer and glide slope transmitters.
The system may be divided functionally into three parts:
(a) Guidance informationlocalizer, glide slope
(b) Range informationmarker beacon, DME
(c) Visual informationapproach lights, touchdown and centerline lights, runway lights.
[3] Pursuant to 28 U.S.C. § 1407 all cases filed in various federal courts throughout the U.S. were transferred to this Court for discovery and preparation for trial.
[4] At the initial MDL organizational meeting in January, 1986, counsel for all Plaintiffs and Defendants were present and Robert Alpert, Senior Vice President and Director of Claims for U.S. Aviation Underwriters announced that anyone who wanted a trial on actual damages could have one immediately and liability would not have to be proven. He assured the attorneys that no claimant would suffer financially while awaiting trial or settlement. Liability would have to be proven in cases in which punitive damages were sought. The Court considered this gesture on behalf of Delta most commendable.
[5] Tex.Civ.Proc. & Rem. § 71.001 et. seq.
[6] Captain Connors had been employed by Delta since its merger with Northeast Airlines in 1972. At the time of the accident Captain Connors had in excess of 20,000 hours of flying experience, 3,000 of which were in the Lockheed L-1011.

First Officer Rudolph P. Price, Jr. had been employed by Delta since 1970. He had accumulated 6,500 hours of flight time, of which approximately 1,200 were in the L-1011. He was flying the approach to 17L at the time of the accident. His estate did not file suit.
Second Officer Nick Nassick had been a Delta employee since 1976. Second Officer Nassick had approximately 6,500 hours of flight time, of which 4,500 were in the L-1011.
[7] Delta and the United States entered into a stipulation (filed February 26, 1988) whereby the United States would not object to any claim for contribution and/or indemnity later made by Delta on the ground that Delta was a volunteer.
[8] The fifth and sixth runways are considerably shorter than the four principal runways and are aligned toward the northwest/southeast.
[9] When landing from the south, these runways are numbered 35L, 35R, 36L, and 36R. The magnetic bearing is 353 degrees.
[10] The Air Traffic Control Handbook (Delta Ex. 5) states that in providing air traffic control services the controllers shall:

2-2 DUTY PRIORITY
a. Give first priority to separating aircraft and issuing safety advisories as required in this handbook. Good judgment shall be used in prioritizing all other provisions of this handbook based on the requirements of the situation at hand.
2-2a Note. Because there are many variables involved, it is virtually impossible to develop a standard list of duty priorities that would apply uniformly to every conceivable situation. Each set of circumstances must be evaluated on its own merit and when more than one action is required, the controller shall exercise his best judgment based on the facts and circumstances known to him. That action which is most critical from a safety standpoint is performed first.
b. Provide additional services to the extent possible, contingent only upon higher priority duties and other factors including limitations of radar, volume of traffic, frequency congestion, and workload.
2-2b Note. The primary purpose of the ATC system is to prevent a collision between aircraft operating in the system and to organize and expedite the flow of traffic. In addition to its primary function, the ATC system has the capability to provide (with certain limitations) additional services. The ability to provide additional services is limited by many factors, such as the volume of traffic, frequency congestion, quality of radar, controller workload, higher priority duties, and the pure physical inability to scan and detect those situations that fall in this category. It is recognized that these services cannot be provided in cases in which the provision of services is precluded by the above factors. Consistent with the aforementioned conditions, controllers shall provide additional service procedures to the extent permitted by higher priority duties and other circumstances. The provision of additional services is not optional on the part of the controller, but rather is required when the work situation permits.
[11] Each plane is depicted on the radar screen as a data block which includes the flight number, speed, altitude, and other information about the particular plane. The numbers making up the data block move across the screen as the plane moves.
[12] Delta Ex. 86.
[13] Delta Ex. 79.
[14] Delta Ex. 23.
[15] Significant Meteorological Information (covers severe weather).
[16] Central Weather Advisory (an unscheduled weather advisory regarding conditions currently existing).
[17] Pilot Report.
[18] See Opinion entered Nov. 5, 1987.
[19] Duke, Vol. 46, pp. 82-85 (references are to volumes of trial transcript).
[20] A Convective storm results from the rising and falling of air due to temperature. Hildebrand, Vol. 95, pp. 101, 102, 103 (Deft. Ex. 518).
[21] Fujita, The Downburst, p. 8; U.S. Ex. 518.
[22] A cumulus cloud is one in the form of individual detached domes or towers which are usually dense and well defined. It develops vertically in the form of rising mounds of which the bulging upper part often resembles a cauliflower. The sunlit parts of these clouds are mostly brilliant white, and their bases are relatively dark and nearly horizontal. U.S. Exhibit 619, p. 146.
[23] Delta Exhibit 3.
[24] Advisory Circular AC 00-50A at 8.
[25] Id. at 14.
[26] Exhibit 518, Dr. FujitaThe Downburst, pp. 33, 34.
[27] There are three general forms of time: Greenwich Mean Time or Zulu, twenty-four hour time, and standard form. Time references in this opinion will be made in standard form post meridian.
[28] An outer marker is an electronic device associated with the ILS located about five (5) miles North of the runway.
[29] A cell is the updraft and downdraft portion of the cloud.
[30] Haggard, Vol. 1, pp. 75, 76.
[31] Automatic Terminal Information Service. ATIS reports give pilots certain landing and weather information in a brief, repeating format. Each ATIS is described by a letter; for example, ATIS Romeo would be followed by ATIS Sierra.
[32] Scattereda sky cover of clouds less than 50%. Brokena sky cover of clouds more than 50%.
[33] A cumulonimbus cloud is a cumuliform cloud type. It is heavy and dense, with considerable vertical extent in the form of massive towers; it often has tops in the shape of an anvil or massive plume. Under the base of cumulonimbus, which is often very dark, there frequently exists virga, precipitation, and low, ragged clouds (scud), which may or may not be merged with it. This cloud is frequently accompanied by lightning, thunder, and sometimes hail. It occasionally produces a tornado or a waterspout, which is the ultimate manifestation of the growth of a cumulus cloud, occasionally extending well into the stratosphere. U.S. Exhibit 619, p. 145.
[34] Fujita, DFW Microburst. (Delta Exhibit 517) T. Theodore Fujita is a noted meteorologist at the University of Chicago. The technical information contained in this Opinion was obtained by visual inspection of the area and from the Digital Flight Data Recorder, the so-called "black box."
[35] Delta Exhibit 468B, Shreveport High Manual Tab, p. 4; see also flight track of aircraft during this portion of flight, Delta Exhibit 700.
[36] Delta Exhibit 468B, Shreveport High Manual Tab, p. 8.
[37] Delta Exhibit 468B, Shreveport High Manual Tab, p. 8.
[38] Delta Exhibit 468B, Shreveport High Manual Tab, p. 9.
[39] While the controller mistakenly said "American 191," it is obvious from reading the transmissions that he was talking to Delta Flight 191.
[40] Delta Exhibit 468B, Texarkana High Radar Tab, p. 2.
[41] Delta Exhibit 468B, Texarkana High Radar Tab, p. 2. See also, Delta Exhibit 700.
[42] Delta Exhibit 468B, Texarkana High Radar Tab, p. 3reference to "three zero".
[43] Delta Exhibit 469.
[44] Magazzine, Vol. 8, p. 5.
[45] Haggard, Vol. 1, pp. 99, 173, 181.
[46] Williams, Vol. 16, pp. 105-107.
[47] Delta Exhibit 468A, LCE Tab, p. 48.
[48] U.S. Exhibit 404A.
[49] Del Prete, Vol. 36, pp. 159-160, 163; Delta Exhibit 172.
[50] Delta Exhibit 469.
[51] Haggard, Vol. 1, pp. 99, 184.
[52] Leech, Vol 85, p. 120; Manningham, Vol. 107, pp. 151, 153-154.
[53] Delta Exhibit 469; Delta Exhibit 468-A.
[54] Delta Exhibit 635-A.
[55] Tollenaar, Vol. 93, pp. 127-128; Hildebrand, Vol. 96, pp. 125-126.
[56] Tollenaar, Vol. 93, pp. 128-129.
[57] Tollenaar, Vol. 93, p. 128.
[58] Tollenaar, vol. 93, p. 130; Hildebrand, Vol. 96, p. 126.
[59] Tollenaar, Vol. 93, p. 131.
[60] Ferguson, Vol. 8, pp. 157-158.
[61] Ankerson, Vol. 92, p. 173.
[62] Ankerson, Vol. 92, p. 174.
[63] Ankerson, Vol. 92, p. 175.
[64] Haggard, Vol. 1, pp. 105, 184; Vol. 2, p. 44.
[65] Gwinn, Vol. 31, pp. 91-94; Manningham, Vol. 107, pp. 157-158 (up to 37,000 feet and down to the ground).
[66] Delta Exhibit 468A, Feeder East tab, p. 50.
[67] Delta Exhibit 708; Hubbert, Vol. 52, pp. 30, 43-44.
[68] Brecheen, Vol. 8, pp. 200-202.
[69] Paup, Vol. 16, pp. 31, 37; Delta Exhibit 220, a memo from Jack Paup, requires such a notification: "DFW TRACON is the only FAA facility outside of the Center that we brief on a routine basis. However, the CWSU has the responsibility of notifying approach facilities of weather that will affect normal operations. This function is normally performed by a telephone call from the Meteorologist."
[70] Dixon, Vol. 82, pp. 134, 138-140, 152; U.S. Exhibit 751.
[71] Hildebrand, Vol. 96, pp. 137-140.
[72] Id.
[73] U.S. Exhibit 732-A-6; Hildebrand, Vol. 96, pp. 141-143; Manningham, Vol. 107, pp. 164-165 (Cell D at this time was a level 3 or higher).
[74] Hildebrand, Vol. 96, pp. 145-146; Manningham, Vol. 107, pp. 164-165 (at this point the scanning height of DL 191's radar was at least 20,000 feet, so 191 could scan everything SEP could, and could see the entire vertical profile of the cells); U.S. Exhibit 732-A-6.
[75] Hildebrand, Vol. 96, p. 53.
[76] Manningham, Vol. 107, p. 155. This section is not intended to be a comprehensive list of what was on various aircrafts' radar. The evidence clearly establishes that nearly every aircraft with its radar on and operating properly obtained contours before the accident. See Summary of Aircraft Radar Observations previously submitted.
[77] Paup, 16, pp. 3, 5, 25, 37, 39, 43, 44, 81-83. See also Krantz, Vol. 26, pp. 30-32 (importance of CWSU information to ATC).
[78] Tarbet, Vol. 8, p. 138.
[79] Hubbert, Vol. 52, pp. 43-44; Delta Exhibit 708; Delta Exhibit 468(a), Feeder East Tab, p. 53.
[80] Delta Exhibit 469.
[81] Hildebrand. Vol. 96, p. 142.
[82] Hildebrand, Vol. 96, p. 160.
[83] U.S. Exhibit 732-A-1; Hildebrand, Vol. 96, p. 160.
[84] Leech, Vol. 85, pp. 118-119.
[85] Duke, Vol. 48, pp. 148-152.
[86] Duke, Vol. 48, p. 154.
[87] Duke, Vol. 48, p. 155.
[88] Haggard, Vol. 2, pp. 56-61; Duke, Vol. 48, p. 151.
[89] Duke, Vol. 48, p. 24.
[90] Foe, Vol. 8, pp. 219-222.
[91] U.S. Exhibit 404A; Alger, Vol. 111, p. 191; Manningham, Vol. 108, pp. 82-84.
[92] Toler, Vol. 12, pp. 28-30.
[93] Glenn, Vol. 8, pp. 119-121, 129-130.
[94] Porter, Vol. 59, pp. 110-111.
[95] Delta Exhibit 228; Duke, Vol. 48, pp. 11, 156; Williams, Vol. 16, pp. 108, 126-127.
[96] Williams, Vol. 16, pp. 131-132; Duke, Vol. 48, p. 23.
[97] Del Prete, Vol. 36, pp. 187-188.
[98] Robbins, Vol. 9, pp. 82-87.
[99] Hubbert, Vol. 52, p. 42; Delta Exhibit 468A, Feeder East Tab, p. 54; Delta Exhibit 708.
[100] Hubbert, Vol. 52, pp. 43-44; Delta Exhibit 708.
[101] Beaudoin, Vol. 40, pp. 82, 87; McDermott, Vol. 11, p. 78.
[102] Magazzine, Vol. 8, pp. 6-7, 10.
[103] Del Prete, Vol. 36, p. 187.
[104] Del Prete, Vol. 36, pp. 188-191.
[105] Brown depo. Joint Exhibit 5, pp. 19, 32.
[106] Delta Exhibit 469.
[107] U.S. Exhibit 732-A-6; Hildebrand, Vol. 97, pp. 12-13.
[108] U.S. Exhibit 732-A-7; Hildebrand, Vol. 97, pp. 13-14.
[109] Delta Exhibit 468A, Feeder East Tab, p. 55; Hubbert, Vol. 52, pp. 3-4.
[110] Delta Exhibits 635Z-1 and 635Z-2.
[111] Hubbert, Vol 52, pp. 4-5.
[112] Hildebrand, Vol. 96, pp. 19-27; Manningham, Vol. 107, pp. 175-176; U.S. Exhibit 732-A-1.
[113] Hildebrand, Vol. 96, pp. 19-27; U.S. Exhibit 732-A-1, 732-A-5, 732-A-7.
[114] Hildebrand, Vol. 96, pp. 26-27.
[115] Manningham, Vol. 107, pp. 175-176; see also U.S. Exhibit 732-A-6.
[116] Hildebrand, Vol. 96, pp. 35-36.
[117] Skipworth, Vol. 25, p. 127.
[118] Delta Exhibit 469.
[119] U.S. Exhibit 145.
[120] Dave Davis, Vol. 5, p. 131; Coughlin, Vol. 91, pp. 196-197.
[121] Hildebrand, Vol. 97, pp. 65-66, 93.
[122] Hildebrand, Vol. 97, pp. 61-67, 97.
[123] Hildebrand, Vol. 97, p. 101; Manningham, Vol. 108, pp. 16-17.
[124] Hildebrand, Vol. 97, p. 102; see also Hildebrand, Vol. 97, pp. 61-67.
[125] Hildebrand, Vol. 97, p. 104.
[126] Manningham, Vol. 108, pp. 3-4.
[127] Delta Exhibit 469; Delta Exhibit 468A, Interphone Tower/TRACON Tab, p. 6.
[128] Delta Exhibit 205; Haggard, Vol. 1, pp. 116-118, McDermott, Vol. 10, p. 67.
[129] Hensley, Vol. 55, pp. 156-157, 176-177; McDermott, Vol. 10, pp. 66-67, Vol. 14, pp. 64, 65.
[130] Beaudoin, Vol. 40, p. 87.
[131] Delta Exhibit 205; Wayson, Vol. 53, pp. 115-116; Beaudoin, Vol. 40, p. 88 and Vol. 43, pp. 150, 137; McDermott, Vol. 10, p. 67; Wayson, Vol. 53, p. 113.
[132] Hildebrand, Vol. 96, pp. 3-4; U.S. Exhibit 733-Q.
[133] U.S. Exhibit 728-A; Hildebrand, Vol. 96, pp. 16-18.
[134] Hildebrand, Vol. 96, p. 4.
[135] Hildebrand, Vol. 96, pp. 5-7.
[136] Hildebrand, Vol. 95, pp. 183-187, Vol. 96, p. 4; U.S. Exhibit 131.
[137] Hildebrand, Vol. 95, pp. 183, 192; Del Prete, Vol. 36, p. 161; U.S. Exhibit 324.
[138] Hildebrand, Vol. 96, pp. 14-15. A determination of the descent rate of the microburst is necessary to locate the water within the cloud. The location of the water in turn determines whether Cell D would have contoured on DL 191's radar as the aircraft approached from Blue Ridge.
[139] Delta Exhibit 469.
[140] The parties stipulated to this fact. Vol. 97, pp. 99-100.
[141] Bolman, Vol. 70, p. 51.
[142] Hildebrand, Vol. 97, p. 37.
[143] Hildebrand, Vol. 97, p. 105.
[144] Delta Exhibit 469.
[145] Bolman, Vol. 70, pp. 64-65.
[146] Hildebrand, Vol. 97, p. 36.
[147] Smith, Vol. 71, p. 197.
[148] Leech, Vol. 85, p. 137; Manningham, Vol. 107, p. 192; Bolman, Vol. 70, pp. 64-65; Hildebrand, Vol. 97, p. 36.
[149] Stanley, Vol. 12, pp. 7-9.
[150] Lewis, Vol. 6, pp. 34, 35.
[151] Lewis, Vol. 6, p. 35.
[152] Lewis, Vol. 6, p. 12.
[153] Hildebrand, Vol. 96, p. 28.
[154] Dobson, Vol. 17, pp. 11, 12, 38, 47; Hildebrand, Vol. 97, p. 18; U.S. Exhibit 732-A-3.
[155] Dobson, Vol. 17, pp. 45-46; Hildebrand, Vol. 97, p. 34.
[156] Dobson, Vol. 17, p. 47; Hildebrand, Vol. 97, pp. 29-30.
[157] Dobson, Vol. 17, p. 74.
[158] Dobson, Vol. 17, pp. 50-51.
[159] Dobson, Vol. 17, p. 51.
[160] Dobson, Vol.. 17, p. 82.
[161] Hildebrand, Vol. 97, p. 30.
[162] Robertson, Vol. 37, pp. 92, 97.
[163] Robertson, Vol. 37, pp. 93-94; Hildebrand, Vol. 97, pp. 40-41.
[164] Robertson, Vol. 37, pp. 93-94; Hildebrand, Vol. 97, p. 55.
[165] Robertson, Vol. 37, p. 94.
[166] Robertson, Vol. 37, p. 95; Hildebrand, Vol. 97, p. 55.
[167] Robertson, Vol. 37, pp. 90-91, 93; Hildebrand, Vol. 97, p. 41.
[168] U.S. Exhibit 469. See also Delta Exhibit 517, Fujita book, DFW Microburst on August 2, 1985, p. 80, column labeled ZZlst (feet).
[169] U.S. Exhibit 32-A (POM).
[170] Delta Exhibit 469.
[171] The altitude of 200 feet is derived from subtracting the published runway altitude of 562 feet from the stated barometric altitude of 762 feet.
[172] Leech, Vol. 85, p. 140, Vol. 85, pp. 141-142, Vol. 87, pp. 89-90; Manningham, Vol. 107, p. 194.
[173] Delta Exhibit 469.
[174] Delta Exhibit 469.
[175] Bautz, Vol. 3, p. 28; Bray, Vol. 73, p. 72; Mullins, Vol. 109, p. 107, 113; Brady, Vol. 19, pp. 78-79.
[176] Bautz, Vol. 3, p. 28; Brady, Vol. 19, p. 79.
[177] Delta Exhibit 469.
[178] U.S. Exhibit 406.
[179] Cockpit voice recorder: a device that records all intra-cockpit conversation.
[180] Duke, vol. 46, pp. 63-64.
[181] At 6:04:00, the plane was transitioning from cell C to Cell D in light rain. Haggard, vol. 1, p. 119, vol. 2, p. 100.
[182] Hildebrand, Vol. 95, pp. 133-134; Duke, Vol. 45 p. 134, Vol. 48 pp. 152-153, 176, 183; McCarthy, Vol. 103, p. 39, Vol. 104 p. 37; Haggard, Vol. 2 p. 86.
[183] Melvin, Vol. 33, p. 123; Leech, Vol. 84, pp. 65-66.
[184] Melvin, Vol. 36, p. 113.
[185] Delta Exhibit 3, U.S. Exhibit 84, Kelly Vol. 81 p. 41.
[186] U.S. Exhibit 732-A-6; Hildebrand, vol. 97, p. 12-13.
[187] Leech, Vol. 85, p. 120; Manningham, Vol. 107, p. 151-154.
[188] Manningham, Vol. 107, p. 155.
[189] Hildebrand, Vol. 95 pp. 96-97; McCarthy, Vol. 104, p. 3.
[190] McCarthy, Vol. 104, p. 26.
[191] According to the testimony of Robertson, pilot of the Aero Commander, the thunderstorm in Cell D looked hazardous from the North.
[192] V-ref is the speed, calculated with reference to the weight of the airplane, 30 percent above stall. It is used by pilots during the approach and landing phase of the flight. Leech, vol. 84, p. 52.
[193] Delta Exhibit 517.
[194] Bautz, Vol. 3, p. 59; Mullins, vol. 109, p. 156-157.
[195] McCarthy, Vol. 102, p. 183-184.
[196] Bray, vol. 73, pp. 43-44.
[197] Leech Vol. 84, p. 130; McCarthy Vol. 103, pp. 41-42.
[198] Bray, Vol. 73, pp. 70-71; Vol. 75, pp. 2-5.
[199] Manningham, vol. 107, pp. 80-81; Bray, vol. 75, pp. 100-102.
[200] Leech, vol. 84, p. 66.
[201] Leech Vol. 84, p. 127-130.
[202] Bray, Vol. 75, p. 2-5, 103-104.
[203] Kater, Vol. 77, p. 136.
[204] Kater, Vol. 79, p. 69.
[205] Kater, Vol. 79, p. 78.
[206] Kater, Vol. 79, p. 81.
[207] As the plane approaches a stall, the control column and wheel held by the pilot begins to shake, indicating an impending stall.
[208] Kelly, Vol. 81, p. 4; Manningham, Vol. 107, p. 92.
[209] Kater, Vol. 78, p. 23; Kelly, Vol. 81, pp. 61-62.
[210] Alger, Vol. 112, p. 31; Kelly, Vol. 81, p. 17; Kater, Vol. 77, p. 105.
[211] U.S. Exhibit 547, p. 19.
[212] U.S. Exhibit 547, pp. 21-23.
[213] David, Vol. 5, pp. 201-202; Robbins, Vol. 9, p. 122; Gliedt, Vol. 106, p. 57.
[214] Manningham, Vol. 107, pp. 21-22.
[215] McCleery, Vol. 6, p. 87; Ohmsider, Vol. 93, p. 113.
[216] U.S. Exhibit 137-A; Manningham, Vol. 107, pp. 25, 27-30.
[217] Gliedt, Vol. 106, pp. 28-29.
[218] Manningham, Vol. 107, p. 38.
[219] Manningham, Vol. 107, p. 40.
[220] Manningham, Vol. 107, p. 40.
[221] U.S. Exhibit 640-A; Davis, Vol. 65, p. 135.
[222] Davis, Vol. 65, p. 160; Melvin, Vol. 35, pp. 65-67.
[223] Leech, Vol. 85, pp. 95-96; Manningham, Vol. 107, p. 104.
[224] Davis, Vol. 66, p. 28.
[225] Kowalsky, Vol. 64, pp. 122-123.
[226] Barker, Joint Ex. 2, pp. 133-134.
[227] Kennedy, Vol. 58 pp. 44, 61-62.
[228] U.S. Exhibit 211; Skipworth, Vol. 60, p. 17, Vol. 61, p. 73; Archung, Vol. 61, pp. 161-162; Beaudoin, Vol. 39, pp. 3-4.
[229] Skipworth, Vol. 61, pp. 74-76; Archung, Vol. 61, pp. 167-169; Kennedy, Vol 58, p. 57.
[230] Kennedy, Vol. 58, pp. 55-56.
[231] Kennedy, Vol. 58, pp. 55-57.
[232] Kennedy, Vol. 58, pp. 63-64.
[233] Kennedy, Vol. 58, pp. 75-76.